**LENROOT, Chief of Children's Bureau, U. S. Department of Labor, v. WESTERN UNION TELEGRAPH CO.**

District Court, S. D. New York.

Oct. 7, 1943.

Judgment Affirmed March 3, 1944.

Douglas B. Maggs, Sol., Irving J. Levy, Associate Sol., and Julius Schlezinger, Principal Atty., all of Washington, D. C., and John K. Carroll, Regional Atty., and John A. Hughes, Atty., United States Department of Labor, both of New York City, (Charles M. Joseph, of New York City, of counsel), for plaintiff.

Francis R. Stark and Clarence W. Roberts, both of New York City, for defendant.

RIFKIND, District Judge.

All the facts have been stipulated and both parties move for summary judgment. Plaintiff is the Chief of the Children's Bureau of the United States Department of Labor, who is authorized, "subject to the direction and control of the Attorney

General," to bring this action. Section 12(b) of the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 212(b).

Defendant is engaged in the transmission and delivery of telegraph messages throughout the United States and in foreign countries. Its principal office is within the Southern District of New York.

The action is to enjoin defendant from violating the provision of Section 15(a) (4) of the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 215(a)(4). The violations alleged are that, within the period beginning January 1, 1941, and continuing to the date of the complaint, defendant has been engaged in shipping telegraph messages in interstate commerce and in delivering telegraph messages for shipment in interstate commerce, such messages having been produced in its establishments in which oppressive child labor was employed.

The oppressive child labor was of two categories: (1) Within the period beginning January 1, 1941, and continuing to the date of the complaint, defendant employed in its establishments minors under 16 years of age; (2) within the period beginning January 1, 1942, and continuing to the date of the complaint, defendant employed in its establishments minors between 16 and 18 years of age in the occupation of motor vehicle driver.

The relevant statutory and regulatory provisions are set out in the margin.[1]

---

[1] "Sec. 3. As used in this Act— * * *

"(i) 'Goods' means goods (including ships and marine equipment), wares, products, commodities, merchandise, or articles or subjects of commerce of any character, or any part or ingredient thereof, but does not include goods after their delivery into the actual physical possession of the ultimate consumer thereof other than a producer, manufacturer, or processor thereof.

"(j) 'Produced' means produced, manufactured, mined, handled, or in any other manner worked on in any State; and for the purposes of this Act an employee shall be deemed to have been engaged in the production of goods if such employee was employed in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or in any process or occupation necessary to the production thereof, in any State. * * *

"(l) 'Oppressive child labor' means a condition of employment under which (1) any employee under the age of sixteen years is employed by an employer (other than a parent or a person standing in place of a parent employing his own child or a child in his custody under the age of sixteen years in an occupation other than manufacturing or mining) in any occupation, or (2) any employee between the ages of sixteen and eighteen years is employed by an employer in any occupation which the Chief of the Children's Bureau in the Department of Labor shall find and by order declare to be particularly hazardous for the employment of children between such ages or detrimental to their health or well-being; but oppressive child labor shall not be deemed to exist by virtue of the employment in any occupation of any person with respect to whom the employer shall have on file an unexpired certificate issued and held pursuant to regulations of the Chief of the Children's Bureau certifying that such person is above the oppressive child-labor age. The Chief of the Children's Bureau shall provide by regulation or by order that the employment of employees between the ages of fourteen and sixteen years in occupations other than manufacturing and mining shall not be deemed to constitute oppressive child labor if and to the extent that the Chief of the Children's Bureau determines that such employment is confined to periods which will not interfere with their schooling and to conditions which will not interfere with their health and well-being."

"Sec. 12. (a) After the expiration of one hundred and twenty days from the date of enactment of this Act, no producer, manufacturer, or dealer shall ship or deliver for shipment in commerce any goods produced in an establishment situated in the United States in or about which within thirty days prior to the removal of such goods therefrom any oppressive child labor has been employed: *Provided*, That a prosecution and conviction of a defendant for the shipment or delivery for shipment of any goods under the conditions herein prohibited shall be a bar to any further prosecution against the same defendant for shipments or deliveries for shipment of any such goods before the beginning of said prosecution.

"(b) The Chief of the Children's Bureau in the Department of Labor, or any of his authorized representatives, shall make all investigations and inspections under section 11 (a) with respect to the employment of minors, and, subject to the direction and control of the Attorney General, shall bring all actions under section 17 to enjoin any act or practice which is unlawful by reason of the existence of oppressive child labor, and shall administer all other provisions of this Act relating to oppressive child labor."

"Sec. 13. (c) The provisions of section

Only two questions are presented for decision: Are the activities of the defendant subject to the child labor provisions of the Act? If the answer is in the affirmative, should injunctive relief be granted? It is the contention of defendant that it is not a "producer, manufacturer or dealer," that it does not "ship or deliver for shipment in commerce any goods." It is engaged, the defendant argues, in the transmission of ideas, whereas the statute governs only the shipment of tangible goods. Plaintiff argues that there is no such limiting language expressed in the statute and that no

---

12 relating to child labor shall not apply with respect to any employee employed in agriculture while not legally required to attend school, or to any child employed as an actor in motion pictures or theatrical productions."

"Sec. 15. (a) After the expiration of one hundred and twenty days from the date of enactment of this Act, it shall be unlawful for any person— * * *

"(4) to violate any of the provisions of section 12." 29 U.S.C.A. §§ 203(i, j, *l*), 212(a, b), 213(c), 215(a) (4).

November 27, 1939.

Child Labor Regulations
Order No. 2

Occupations Particularly Hazardous for the Employment of Minors Between 16 and 18 Years of Age Or Detrimental to Their Health or Well-Being

Sec. 422.2 Motor-vehicle driver and helper.—(a) Finding of fact.—By virtue of and pursuant to the authority conferred by section 3(*l*) of the Fair Labor Standards Act of 1938 and pursuant to the regulation prescribing the "Procedure Governing Determinations of Hazardous Occupations"; an investigation having been conducted with respect to the hazards for minors between 16 and 18 years of age of employment in the occupations of motor-vehicle driver and helper; a report of the investigation having been submitted to the Chief of the Children's Bureau showing that:

"1. Work on motor vehicles involves a high degree of accident risk for persons of all ages, a risk which is particularly high in the case of young persons, who are lacking in the experience and in the caution required for safety in motor-vehicle operation.

"2. Workmen's compensation experience generally shows for the occupational classifications representing motor-vehicle drivers and helpers a compensation cost higher than the average for manufacturing classifications.

"3. The opinion of experts in motor-vehicle safety and of others having practical experience in the field of motor-vehicle operation who were consulted in the course of the investigation is that employment as driver or as helper on motor vehicles is especially hazardous for young persons.

"4. Motor-vehicle drivers between 16 and 18 years of age have been found to be involved in a larger number of fatal accidents in proportion to miles driven than drivers in any older age group. In a study covering fatal accidents within a 5-year period in one State the fatal-accident rate was found to be nine times greater for 16-year-old drivers and six times greater for 17-year-old drivers than for those 45 to 50 years of age, the age group with the lowest fatal-accident rate.

"5. Under many industry codes adopted pursuant to the National Industrial Recovery Act the work of motor-vehicle drivers and helpers was listed as a hazardous occupation and as such was prohibited for minors under 18 years of age.

"6. Acting pursuant to the authority conferred upon it by the Motor Carrier Act of 1935 [49 U.S.C.A. § 301 et seq.] the Interstate Commerce Commission has established as necessary for safety a minimum age of 21 years for motor-vehicle drivers, in regulations applicable to common carriers and contract carriers engaged in interstate commerce. An examiner for the Commission has recommended, after investigation and public hearing, that the same minimum age for motor-vehicle drivers be applied, with certain exceptions not here material, to private carriers engaged in interstate commerce.

"7. State legislation, which reflects public recognition of the special hazards incident to the driving of motor vehicles by young persons, has established the following standards:

"(a) In each of the States and the District of Columbia there is a legal minimum age for drivers of motor vehicles which is higher than that for general employment, the legal minimum age for drivers being applicable to (1) all persons operating motor vehicles, or (2) persons operating motor vehicles as employees, or (3) persons operating motor vehicles for common, contract, or private carriers.

"(b) In 28 States and the District of Columbia there is a minimum age of at least 18 years applicable to (1) all persons operating motor vehicles or (2) persons operating motor vehicles as employees.

"8. A minimum age of 18 years or higher for the employment of motor-vehicle drivers and helpers has been adopted vol-

such limiting intention can be discovered in the policy and history of the statute.

A brief description of what actually occurs at the establishments of the defendant has been stipulated. Messages transmitted by defendant are received and delivered by the following methods: Messengers, over-the-counter, telephone and private telegraph wire. The large majority of messengers use bicycles. A smaller number perform their duties on foot. A still lesser number operate motor vehicles.

Over-the-counter messages are usually inscribed on a telegraph blank by the sender but, sometimes, by employees of defendant. Messages received by private telegraph wire are printed at an office of defendant on a telegraph blank or on gummed paper tape. Messages received by messenger are inscribed by the sender and carried by the messenger to an office of the defendant.

At the office where a message is received for transmission, an employee stamps it with the date and time of filing. He also notes the number of words and the class of telegraph service. If a word is illegible, or if words have been wrongly combined or broken, an employee of defendant makes the necessary correction. The stamped and corrected message is then transmitted to a message center either by means of a teleprinter operated on a telegraphic circuit or by pneumatic tube.

In the message center, each message is marked with the name or symbol of the message center to which it is to be routed. It is then distributed to the proper telegraph circuit for transmission to that message center. In most instances the message is conveyed to the designated message center from the originating message center by teleprinter, multiplex printer or Morse key. When the multiplex printer is used the message is first converted into a perforated paper which is fed into an automatic transmitter. In using either the teleprinter or the multiplex printer, the message is received in the form of symbols reprinted by a machine at the receiving center. When the Morse key is used, the communicating signal is an audible one. An operator at the receiving center translates the audible code signals and reduces them to writing.

From the receiving message center, the messages are routed to the defendant's offices and delivered to the respective sendees by the same means by which the mes-

---

untarily as a general policy by many employers and by the branch of organized labor especially concerned with employment in this field";
a finding and order relating to the employment of minors between 16 and 18 years of age in the said occupations having been proposed for final adoption by the Chief of the Children's Bureau upon the basis of the said report of investigation; a public hearing having been held with respect to the said proposed finding and order; all statements submitted in connection with the said hearing having been fully considered; opportunity having been given to all interested parties to file objections within 15 days following publication in the Federal Register of the proposed finding and order, and no objection disclosing just cause for revision thereof having been received; and sufficient reason appearing therefor.

Now, therefore, I, Katharine F. Lenroot, Chief of the Children's Bureau of the United States Department of Labor, hereby find that the occupations of motor-vehicle driver and helper are particularly hazardous for the employment of minors between 16 and 18 years of age.

(b) Order.—Accordingly, I hereby declare that the occupations of motor-vehicle driver and helper are particularly hazardous for the employment of minors between 16 and 18 years of age.

Definitions. For the purpose of this order—

(1) The term "motor vehicle" shall mean any automobile, truck, truck-tractor, trailer, semi-trailer, motorcycle, or similar vehicle propelled or drawn by mechanical power and designed for use as a means of transportation but shall not include any vehicle operated exclusively on rails.

(2) The term "driver" shall mean any individual who, in the course of his employment, drives a motor vehicle at any time.

(3) The term "helper" shall mean any individual, other than a driver, whose work in connection with the transportation or delivery of goods includes riding on a motor vehicle.

This order shall not justify noncompliance with any Federal or State law or municipal ordinance establishing a higher standard than the standard established herein. This order shall become effective on January 1, 1940, and shall be in force and effect until amended or repealed by order hereafter made and published by the Chief of the Children's Bureau.

Katharine F. Lenroot
Chief of the Children's Bureau.

sages are originally received for transmission at message centers.

On March 31, 1943, 11.14 per cent of defendants messengers were under 16 years of age, and 33/100 of one per cent were between 16 and 18 years of age and employed as operators of motor vehicles.

In analyzing the provisions of the child labor sections of the Fair Labor Standards Act, two general considerations must be observed: First, the incidence of these provisions of the statute is not aimed at those engaged in interstate commerce, nor at those who produce goods for commerce. Cf. Sections 6 and 7 of the Act, 29 U.S.C.A. §§ 206, 207. The statute does not prohibit the employment of child labor.

The ban of the statute is against shipment or delivery for shipment, in commerce, by a producer, manufacturer or dealer of any goods produced in an establishment situated in the United States in or about which any oppressive child labor has been employed. Second, the statute establishes a national policy and a national standard of child labor. It does not constitute merely an additional sanction for the enforcement of varying state child labor laws.

Those two characteristics of the statute are the fruits of a long national debate and considerable legislative experimentation.[2]

The history of the statute is consistent only with the conclusion that Congress intended to keep the arteries of

[2] The first state minimum age law was adopted in 1848, by the State of Pennsylvania. Session Laws 1848, P.L. 278. Twelve years was the minimum established, and it was made applicable to textile factories. As industrialization expanded, awareness of the child labor problem grew. By the turn of the century, 24 States had enacted minimum age standards for various classes of activity. History of Labor in the United States, Commons and Associates, Vol. 3, p. 404, Macmillan Company, New York, 1935. Nevertheless in 1910, nearly two million children, between the ages of 10 and 16, 18 per cent. of the total number of children in that age group, were gainfully employed. Child Labor: Facts and Figures, Publication 197, Revised, Children's Bureau, U. S. Department of Labor, 1933, pp. 2, 70–71.

Congressional attempts to deal with child labor nationally began with the introduction of bills in 1906. It was 10 years, however, before Congress enacted the first Federal Child Labor Law, 39 Stat. 675, c. 432, which extended only to factories, manufacturing establishments, canneries, workshops, mines and quarries. This law was declared unconstitutional. Hammer v. Dagenhart, 1918, 247 U.S. 251, 38 S.Ct. 529, 62 L.Ed. 1101, 3 A.L.R. 649, Ann.Cas.1918E, 724. Congress immediately thereafter made an attempt to regulate child labor by the use of the taxation power. 40 Stat. 1138, c. 18. This, too, was declared unconstitutional by the Supreme Court. Bailey v. Drexel Furniture Co., 1922, 259 U.S. 20, 42 S.Ct. 449, 66 L.Ed. 817, 21 A.L.R. 1432. In 1924, Congress submitted to the States, for ratification, a proposed amendment to the Constitution, authorizing Congress "to limit, regulate and prohibit the labor of persons under 18 years of age." It has been ratified by 28 States.

Under the National Industrial Recovery Act, 48 Stat. 195, 576 Codes were adopted, each of them containing minimum age provisions. After Schechter Poultry Corp. v. United States, 1935, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947, which declared that Act unconstitutional, the number of children leaving school for work sharply increased. Trend of Child Labor 1927–1936, Monthly Labor Review, December 1937, page 1375, published by the United States Department of Labor.

The legislative history of the child labor provisions of the Fair Labor Standards Act began with a message from the President to the Congress on May 24, 1937, Senate Report 884, 75th Congress, First Session. Senator Black and Congressman Connery, on the same day, introduced identical bills which were to become the Fair Labor Standards Act, S. 2475, H. R. 7200. The bills made unlawful the shipment into any State of goods to be sold or used contrary to the laws of that State. It thus followed the model of the Convict Made Goods Act, 49 Stat. 494, 18 U.S.C.A. §§ 396b–396d, and of the pre-prohibition attempts to deal with the liquor traffic. In other respects the child labor provisions were tied in with the provisions regulating wages and hours.

Organizations interested in child-labor legislation appeared before the committees of Congress and urged the vesting of child labor regulation in the Children's Bureau, coverage on an establishment rather than on an employee basis to facilitate enforcement, and the adoption of a uniform national age minimum. These proposals provoked wide divergence of opinion and division between the two Houses. These differences were not resolved until a conference committee reported the bill in the form in which it was enacted. See S. 2475, Section 23(e), 75th Congress, First Session, as reported

commerce free from pollution by the sweat of child labor. To accomplish this result with the least difficulty, the law prohibited the introduction into the stream of commerce, not only of the products of child labor but of all of the products of an establishment where any child labor had been employed within 30 days. In view of the breadth of the congressional policy, the opening hypothesis should be that the defendant is subject to the Act unless reason for lack of application is clearly shown. (I am not speaking of the burden of proof, since the case presents no issues of fact.)

■ We look first to the list of exemptions enacted by Congress. Section 13(c) exempts one class of agricultural employees. It further makes the law inapplicable "to any child employed as an actor in motion pictures or theatrical productions." I think I may take·judicial notice of the fact that for a generation or more the employment of young messengers by the telegraph companies in the United States has been open and notorious. How simple it would have been, were such the intention of Congress, to add to Section 13(c) a few words describing them. Indeed, in another connection, messengers are expressly mentioned in Section 14, 29 U.S.C.A. § 214. The answer to this query might be that such an express exemption would be inconsistent with the scheme of the Act which, it is asserted, deals only with tangibles; but observe the words "theatrical productions." Granted that motion picture producers manufacture tangible film, what tangible goods are produced at a theatrical production? Theatrical productions can be tele-casted or televised. Manifestly Congress was unwilling to rely on the intangible character of such goods to take them out of the statutory prohibition and granted an express exemption to child actors. It gave no such explicit sanction to the employment of children as telegraph messengers.

Defendant's chief reliance is upon the "obvious and natural import of the language." United States v. Goldenberg, 1897, 168 U.S. 95, 102, 18 S.Ct. 3, 4, 42 L.Ed. 394; Lynch v. Alworth-Stephens Co., 1925, 267 U.S. 364, 370, 45 S.Ct. 274, 69 L.Ed. 660. The words "producer" and "goods" especially when used in a context with "ship," it is contended, require a construction of the statute which limits its application to producers of goods that can be shipped, or tangible goods.

■ Reliance upon the common meaning of the terms employed is misplaced when Congress has enacted definitions which necessarily displace both the dictionary and common usage as authority for the meanings of the words employed. Thus, under the statute, "produced" includes "handled, or in any other manner worked on." Section 3(j). "Goods" includes "articles or subjects of commerce of any character." Section 3(i). If only tangible goods were within the purview of the statute, what do the emphasized words add to the words "wares, products, commodities, merchandise," which precede them? Assuming that "articles * * * of commerce" might be disregarded as no more than a verbal flourish, usually deprived of effect by the rule of noscitur a sociis (State of Virginia v. Tennessee, 1893, 148 U.S. 503, 519, 13 S.Ct. 728, 37 L.Ed. 537; United States v. Baumgartner, D.C.S.D.Cal., 259 F. 722, 724), the insertion of "subjects of commerce" seems insistently to demand that tangibility shall not be the required attribute of the goods. The phrase "subjects of commerce" has a history which the manifest professional draftsmanship of the statute must be deemed to have recognized. In Gibbons v. Ogden, 1824, 9 Wheat. 1, 229, 6 L.Ed. 23, the court said: "Commerce, in its simplest signification, means an exchange of goods; but in the advancement of society, labor, transportation, intelligence, care, and various mediums of exchange, become commodities, and enter into commerce; the subject, the vehicle, the agent, and their various operations, become the objects of commercial regulation." In Western Union Teleg. Co. v. Pendleton, 1887, 122 U.S. 347, 7 S.Ct. 1126, 1127, 30 L.Ed. 1187, the court indicated that the

to the Senate; 81 Congressional Record, pages 7949 to 7951; S. 2475, Section 10 (a) and Section 10(b), 75th Congress, Third Session, as reported to the House, April 21, 1938; 82 Congressional Record, page 1780; Conference Report No. 2738, House of Representatives, 75th Congress, Third

Session, to accompany S. 2475, June 11, 1938, page 32.

This Act was held constitutional, and Hammer v. Dagenhart, overruled in United States v. Darby, 1941, 312 U.S. 100, 657, 61 S.Ct. 451, 85 L.Ed. 609, 132 A. L.R. 1430.

subject of the commerce of the telegraph companies was the "ideas, wishes, orders, and intelligence" carried by them.

In Utah Power & Light Co. v. Pfost, 1932, 286 U.S. 165, 180, 52 S.Ct. 548, 551, 76 L.Ed. 1038, the court was discussing the generation and transmission of electrical energy. It reflected no hesitation in describing the process as one of "production as well as transmission of a definite supply of an article of trade." If the mysterious flow of intangible and invisible electrical energy can be described as an article of trade, I see no reason why it should lose that character when freighted with intelligence. That telegraph messages "constitute a portion of commerce itself," has been said by the court in Western Union Teleg. Co. v. James, 1896, 162 U.S. 650, 654, 16 S.Ct. 934, 935, 40 L.Ed. 1105.

■ The fact that in the course of the legislative career of the statute, the phrase "articles of trade of any character" which appeared in S. 2475 (introduced in the Senate on May 24, 1937) became "articles or subjects of commerce of any character," in the bill as it passed the Senate and was accepted by the Conference Committee, can only reflect an intention to expand the coverage of the Act.

Once we reach the conclusion that the messages telegraphed by defendant are goods within the meaning of the statute, there is not much difficulty in finding that these goods are produced in the defendant's establishments. Clearly they are "handled" and "worked on." In the light of the statutory definition, the argument that the defendant simply transmits the ideas of its customers and that it is not a producer, must fall as a matter of law. It falls also as a matter of fact, for it is the work of the defendant which transmutes the ideas of the customers into telegraphic messages by means of a series of changes and processes already described.

■ More troublesome is the question whether the defendant "shipped" goods in commerce. The word "ship" is not defined by the statute. Since the verb, "shipped," is derived from the noun, "ship," linguistic purists might limit its connotation to transportation by water. Common usage, however, has long sanctioned the use of the phrases, to ship by rail, or to ship by air, or to ship by truck. It is used synonymously with transport and convey. The defendant conveys its messages by wire. The Supreme Court has spoken of the telegraph companies as engaged in "transportation." It has called the defendant a "carrier of messages" and compared it to a railroad, as a "carrier of goods." Western Union Teleg. Co. v. Texas, 1881, 105 U.S. 460, 464, 26 L.Ed. 1067, referring to Pensacola Teleg. Co. v. Western Union Teleg. Co., 96 U.S. 1, 24 L.Ed. 708.

■ I do not think that Congress intended to limit the application of the Act to the conventional modes of shipment. Its broad policy was to keep the streams of interstate commerce undefiled by the products of child labor. It is a remedial statute entitled to liberal interpretation. Missel v. Overnight Motor Transportation Co., 4 Cir., 1942, 126 F.2d 98, 103, affirmed 316 U.S. 572, 62 S.Ct. 1216, 86 L.Ed. 1682. One cannot escape the prohibition of the statute by inventing a magic carpet.

Bartholome v. Baltimore Fire Patrol & Despatch Co., D.C. 1942, 48 F.Supp. 98, 102, supports the view, here rejected, that the statute deals only with tangible goods. The authority of the case has been dimmed by the rejection of its holding in Walling v. Sondock, 5 Cir., 1942, 132 F.2d 77, certiorari denied, 318 U.S. 772, 63 S.Ct. 769, 87 L.Ed. ——.

■ Since I have found that, within the meaning of the child labor provisions of the Act, the defendant is a producer engaged in shipping, in commerce, goods produced in establishments where oppressive child labor is employed, I must conclude that the defendant is violating the statute.

The final question is whether plaintiff is entitled to injunctive relief.

■ The remedy is authorized by Section 17, 29 U.S.C.A. § 217. Against the granting of the remedy the defendant urges the argument of public policy. No one can question the imperative demand for telegraphic communication in furtherance of the war effort, both in military activity and in the production of the tools of warmaking. I accept also the proposition that public interest is a proper ingredient for consideration whenever the extraordinary remedy of injunction is sought. Here, however, we have two public interests to subserve, one suggested by defendant, the precise character of which, as well as its reach, courts can only discover in very

vague and general terms, and one declared by Congress, after a great national debate. Under such circumstances I hold to the view that the function of the courts is to accept the mandate of the Congress and not to blunt the thrust of its purpose with the barnacles of individual exceptions. Congress is well aware of the problems of the defendant. Only very recently it found time to authorize defendant's merger with Postal Telegraph Company. If the execution of the statutory command is an unreasonable burden upon the prosecution of the war, Congress, which has means of ascertaining all the facts, rather than the courts, should be called upon for relief. So far, however, Congress has refused to heed similar pleas from other sections of industry affected by the ameliorative measures enacted during the past decade.

Plaintiff is entitled to a decree; and upon the settlement thereof the Court will hear the parties concerning the ways and means of avoiding any interruption of defendant's business.

Decree for plaintiff.