**TRI–STATE BROADCASTING COMPANY, Inc., Appellant,**

v.

**UNITED PRESS INTERNATIONAL, INC., Appellee.**

No. 23087.

United States Court of Appeals
Fifth Circuit.

Dec. 2, 1966.

Archibald A. Farrar, F. H. Boney, Summerville, Ga., for appellant.

Robert S. Sams, Milton A. Carlton, Jr., Atlanta, Ga., for appellee; Troutman, Sams, Schroder & Lockerman, Atlanta, Ga., Baker, Hostetler & Patterson, Cleveland, Ohio, of counsel.

Before RIVES, BELL and THORNBERRY, Circuit Judges.

THORNBERRY, Circuit Judge:

Appellant, Tri-State Broadcasting Company, a Georgia corporation, instituted this claim for treble damages against appellee, United Press International, asserting that UPI had violated Section 2(a) of the Clayton Act, 15 U.S.C. § 13, as amended by the Robinson-Patman Price Discrimination Act, 49 Stat. 1528 (1936), 15 U.S.C. § 13(a). Appellant claims in substance that UPI discriminated against appellant by charging it a substantially higher weekly contract price for UPI's news report service than those prices charged to other radio broadcasting stations operating in the same area. The district court dismissed appellant's complaint on the ground that the news information service supplied by UPI did not constitute a "commodity" within contemplation of the Act. We agree and affirm.

■■ Appellant concedes that "if the subject matter of the contract was not a commodity as intended under the Robinson-Patman Price Discrimination Act then appellant would have no cause of action and the trial court would be correct in its ruling." Although the term "commodity" is nowhere defined in the Act,[1] a review of legislative history together with the sparse body of applicable case law in this area convinces us that the news service involved in this controversy cannot be held to constitute a "commodity" as that term is used in the Act. The contract between the parties provides in pertinent part that

United Press hereby bargains and sells to the Broadcaster the *right and privilege of broadcasting vocally*, on either sustaining or commercial programs over radio stations WGTA located at Summerville, Ga. the United Press full radio News Report, and agrees as far as practicable, to deliver said News Report to the Broadcaster by automatic printer.

(Emphasis added.) While the mere form of a contract will not be given controlling effect if the substance of the

---

1. The pertinent provisions of 15 U.S.C.A. § 13(a) are:

"(a) It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them:
* * * "

15 U.S.C.A. § 14 provides:
"It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, whether patented or unpatented, for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce."

comtemplated transaction brings it within the ambit of the antitrust laws, Butterick Co. v. Federal Trade Comm., 2d Cir. 1925, 4 F.2d 910, in this instance we think it apparent that in essence the transaction contemplates the sale of a privilege to broadcast news information, notwithstanding that incidental to such privilege is the right of appellant to utilize UPI's written news reports. Virtually no transfer of an intangible in the nature of a service, right, or privilege can be accomplished without the incidental involvement of tangibles,[2] and we conclude that in such circumstances the dominant nature of the transaction must control in determining whether it falls within the provisions of the Act. See General Shale Products Corp. v. Struck Const. Co., 6th Cir. 1942, 132 F.2d 425, cert. denied, 1943, 318 U.S. 780, 63 S.Ct. 857, 87 L.Ed. 1148. Here, the dominant purpose of the transaction was not merely the purchase by appellant of tangible written news reports, but rather the valuable right and privilege of broadcasting to its listeners news supplied by a reputable news information service. In substance, the contract contemplates the sale of a service together with the privilege of vocally passing on the information supplied by that service to a radio audience. The news items in their printed form at best represent tangible incidents of appellant's contractual right to utilize UPI's services.

While apparently no court has had occasion to pass upon the specific issue before us, the rationale employed by several courts in somewhat analogous controversies buttresses our conclusion that a contract for the sale of news information services does not constitute the sale of a "commodity" within contemplation of the Act. Columbia Broadcasting System, Inc. v. Amana Refrigeration, Inc., 7th Cir. 1961, 295 F.2d 375, involved a suit by Columbia Broadcasting System for monies due on a contract under which CBS had agreed to produce and broadcast a television show under Amana's sponsorship. In defense of the claim, Amana filed a counterclaim asserting that CBS had granted greater discounts in price to other sponsors in violation of Section 2(a) of the Clayton Act, as amended, 15 U.S.C. § 13(a), and had also required Amana to purchase time over a specified group of network stations in violation of Section 3 of the Act, 15 U.S.C. § 14. In affirming the district court's dismissal of Amana's counterclaim for failing to state a cause of action under the Act, the Court reasoned:

[W]e are of the opinion that the reasonable inferences to be drawn from the allegations concerning the written agreements do not admit of the transaction being accurately characterized as a "sale" of television "time" as it is labeled by Amana nor as merely a "services" contract as argued by CBS. Although both services and time are involved we conclude that in its essence the contract

---

2. Legislative history and subsequent congressional studies clearly indicate that section 2(a) of the Act was intended to encompass only tangible articles of commerce. See 79 Cong.Rec. 9078–79 (1935); Report on the Antitrust Subcommittee on the Television Broadcasting Industry of the House Committee on the Judiciary, 85 Cong., 1st Sess., 66–67 (1957). See also Patman, The Robinson-Patman Act 75 (1938). In 1957, the Chairman of the House Judiciary Committee unsuccessfully sought to amend the Act to define "commodities" as including "services rendered by independent contractors." H.R. 8277, 85th Cong., 1st Sess., 103 Cong.Rec. 9898 (1957). See also 103 Cong.Rec. 9900–9901 (1957).

Representative Patman, co-author of the Act, has stated, "in its broadest sense, the word 'commodity' might possibly include items of trade other than those in tangible form—for example, advertising, insurance, brokerage services, and similar items. However, the word is ordinarily used in the commercial sense to designate any movable or tangible thing that is produced or used as the subject of barter. This is the definition for the word 'commodity' used in the application of the Robinson-Patman Act." Patman, Complete Guide to the Robinson-Patman Act 33 (1963). See also Rowe, Price Discrimination under the Robinson-Patman Act 61–62 (1962).

alleged is a purchase by Amana of the privilege of having itself identified as sponsor of the program broadcast and making use of the permissible portion thereof for advertising its products.

We are mindful of the fact that dictionary definitions of the word "commodity" have included its use in the sense of "privilege." * * * But here we must evaluate the word in the context in which it appears— the purchase, lease or sale of goods, wares, merchandise, machinery or supplies.

295 F.2d at 377–378. Similarly, in United States v. Investors Diversified Services, Inc., D.Minn.1951, 102 F.Supp. 645, the court rejected a contention that a contract for the loan of money secured by real estate mortgages involved a "commodity" as that term is used in Section 3 of the Act, 15 U.S.C. § 14. In a well-reasoned opinion the court concluded:

> Although the phrase "other commodities" appears at the end of the phrase "goods, wares, merchandise, machinery, supplies," the rule of *ejusdem generis* requires that it be confined to articles of the same kind, class, and character as those specifically enumerated. * * * "Commodities" therefore must be given its usual and natural meaning. * * *

> And no good reason is suggested why the Court should distort the usual, accepted meaning of the language used in the Act in order to bring within the purview of this section an article which may be in trade or in commerce, but has never been considered as a commodity as that term is used normally. * * * If Congress had desired synonymy between "commodities" and "commerce", it could have so indicated. * * * That the broad terms and constructions of the Sherman Act cannot be

transplanted automatically into Section 3 of the Clayton Act is evident. 102 F.Supp. at 648–649. See Fleetway, Inc. v. Public Service Interstate Transp. Co., 3d Cir. 1934, 72 F.2d 761; County Theatre Co. v. Paramount Film Distrib. Co., E.D.Pa.1956, 146 F.Supp. 933.

Appellant relies strongly on the case of Western Union Tel. Co. v. Lenroot, 1945, 323 U.S. 490, 65 S.Ct. 335, 89 L.Ed. 414, reversing S.D.N.Y.1943, 52 F.Supp. 142, where the Supreme Court ruled that telegraph messages were "goods" within the meaning of Section 3(i) of the Fair Labor Standards Act of 1938, 29 U.S.C. § 203(i). That Act, however, unlike the Act before us, specifically defines "goods" as including "articles or subjects of commerce of any character." Similarly, appellant's reliance on state court decisions construing state antitrust statutes is unpersuasive to the extent that such statutes are also of significantly more comprehensive breadth than that involved in this controversy. See, e. g., McKinley Tel. Co. v. Cumberland Tel. Co., 1913, 152 Wis. 359, 140 N.W. 38.

In thus concluding that the predominant nature of the contract before us necessitates a rejection of the theory that it contemplates a sale of "commodities" as that term is used in the Act, we are not unmindful of appellant's assertions that our decision could conceivably have the effect of "allowing this company to charge to a 250 watt radio station operating in a small community a weekly rate of any size and charge to a larger supplier such as a 50,000 watt radio station or a chain of radio stations a smaller rate." Our role, however, is to expound the law as promulgated, not to make it, and we therefore refuse to indulge in speculations as to what Congress might have done but did not.[3] Accordingly, the judgment of the district court is

Affirmed.

3. Congressional hearings to consider whether the Act should be amended to cover discriminatory pricing practices with regard to intangibles were scheduled as recently as the fall of 1965. See The Gallagher Report No. 26 (June 30, 1965).