SDK MEDICAL COMPUTER SERVICES CORPORATION & others[1]
*vs.* PROFESSIONAL OPERATING MANAGEMENT GROUP,
INC. & another.[2]

Suffolk.    January 8, 1976. — September 20, 1976.

Present: REARDON, QUIRICO, BRAUCHER, & KAPLAN, JJ.

*Corporation,* Ultra vires. *Practice, Civil,* Parties. *Supreme Judicial Court,* Jurisdiction. *Jurisdiction, Civil,* Administrative matter. *Administrative Matter. Monopoly. Restraint of Trade. Words,* "Aggrieved party."

An action against a nonprofit medical service corporation, organized under G. L. c. 176B, on the ground that it exceeded its lawful powers by organizing and supporting a profit-making corporation to provide

---

[1] Medicompts, Inc.; Standard Systems, Inc.; Medical Information Technology, Inc.; and D P & W, Inc.

[2] Blue Shield of Massachusetts, Inc.

computerized data processing services to physicians could not be maintained by competitors of the data processing corporation. [120-122]

Discussion of the meaning of "aggrieved party" under G. L. c. 176B, § 17. [122-125]

A claim charging unfair competition in violation of G. L. c. 93A, § 11, in an action commenced in the Supreme Judicial Court for the county of Suffolk was transferred to the Superior Court without decision as to whether the grant of jurisdiction to the Superior Court under the statute is exclusive or concurrent. [125-127]

A claim under G. L. c. 93, §§ 2 and 9, could not be maintained against a corporation which engaged only in the sale of computerized data processing service even though some tangible reports were rendered to customers in conjunction with the services. [127-128]

Where a corporation's data processing services did not qualify as "necessities," a claim that the corporation tended to create a monopoly in violation of the common law was properly dismissed. [128-129]

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on April 29, 1975.

The case was heard by *Hennessey, J.,* on a motion to dismiss.

*Edward R. Lev* for the plaintiffs.

*Reginald H. Howe (Daniel O. Mahoney* with him) for the defendants.

KAPLAN, J.   In this action, commenced in the Supreme Judicial Court for the county of Suffolk, the defendants responded to a complaint in four counts by moving to dismiss it under Mass. R. Civ. P. 12 (b), 365 Mass. 754 (1974). A single justice of this court allowed the motion as to all counts, but the practical effect of his disposition was that the plaintiffs would be free to commence an action in the Superior Court on count II, charging unfair methods of competition. The plaintiffs take the present appeal to the full court. We agree in substance with the single justice, but prefer on our own initiative to transfer the claim embodied in count II to the Superior Court.

The core facts alleged in the complaint may be summarized thus. The plaintiffs are five business corporations engaged in providing computerized data processing, record keeping, and billing services for medical practitioners in Massachusetts. One of the defendants named is Blue Shield of Massachusetts, Inc. (Blue Shield), a medical

371 Mass. 117                                    119

SDK Med. Cmptr. Servs. Corp. v. Professional Operating Mgt. Group.

service corporation organized under G. L. c. 176B, operated not-for-profit, which provides health insurance to Massachusetts residents. It is alleged that over 99% of the medical practitioners in the State are Blue Shield participating physicians, and that 60% of the residents of the State are participants in Blue Shield insurance. The other defendant named is Professional Operating Management Group, Inc. (Blue Streak), a business ("for profit") corporation. (The Commissioner of Insurance, who has regulatory and enforcing powers over medical service corporations, was not made a defendant.)

The complaint alleges that Blue Streak was formed in 1974 as a wholly owned subsidiary of Blue Shield and commenced operations in 1975. It furnishes computerized data processing services to physicians which are similar to, and in competition with, those furnished by the plaintiffs. Blue Shield, drawing on its medical service operations, has provided substantial financial resources to Blue Streak for use as working capital. It has made available to Blue Streak facilities and information, essential to Blue Streak's functions, at less than actual cost and at a cost substantially less than Blue Streak would incur if it were operating independently. Blue Streak has thus been enabled to sell its services to potential customers of the plaintiffs at prices less than its costs would be if it did not have the cost advantages of its combination with Blue Shield; such sales below cost are alleged to be an illicit inducement to these physicians to continue their participation in Blue Shield. It is alleged, in addition, that employees of Blue Shield have solicited customers and business for Blue Streak, and that Blue Streak has represented to medical practitioners that Blue Shield will process their insurance claims more expeditiously if they sign up with Blue Streak.

The four counts, severally alleging the core facts with incidental additional averments, present the following theories of liability. Count I, stated to be brought under G. L. c. 176B, asserts in essence that the organization and control of Blue Streak by Blue Shield (accompanied by the

provision to Blue Streak of financial support, facilities, and information) exceed the lawful powers of a medical service corporation. The plaintiffs ask the court to declare that Blue Shield has engaged in such ultra vires activities, and to order Blue Shield to liquidate or divest itself of Blue Streak. Count II is brought under G. L. c. 93A, § 11, and seeks treble damages, apparently against both defendants, as well as liquidation or divestiture, for unfair methods of competition and unfair and deceptive acts or practices. Count III, brought under G. L. c. 93, §§ 1-14, charges the defendants with maintaining a monopoly and causing restraint of trade in violation of G. L. c. 93, § 2. It charges also monopolization under G. L. c. 93, § 9. The ultimate relief apparently sought under this count is an injunction forbidding Blue Shield to compete through Blue Streak or otherwise with private business corporations in the computerized data processing field.[3] Count IV, added to the complaint by amendment, appears to charge an unlawful monopoly at common law, and prays a like injunction and liquidation or divestiture of Blue Streak.

*Count I.* Here the plaintiffs present their theory that they should be freed of competition by Blue Streak because the organization and support of Blue Streak by Blue Shield were ultra vires activities on the latter's part, activities not germane to a medical service corporation or a "non-profit medical service plan" (see G. L. c. 176B, § 1).[4] The count was dismissed for the reason that the plaintiffs were not in a position to maintain a private action against Blue Shield on this ground.[5]

Any claim proceeding on an ultra vires basis or on analogy thereto is seriously challenged by the fact that

---

[3] A similar injunction is prayed for under counts I and II.

[4] The references in this count to particular practices are incidental and serve only to show certain consequences following the basic illegality.

[5] The defendants, however, do not concede that the ultra vires charge has any substantive merit. It may be noted that the complaint does not allege that Blue Shield is being operated for profit.

371 Mass. 117     121

SDK Med. Cmptr. Servs. Corp. *v.* Professional Operating Mgt. Group.

the relation of the plaintiffs to Blue Shield is that of competitors (and at a remove, since the plaintiffs actually compete with Blue Streak, not Blue Shield). It has been accepted in this jurisdiction, and generally, that competitors as such may not maintain private actions challenging the activities of their corporate rivals as being ultra vires. See *Council of Jewish Women* v. *Boston Section Council of Jewish Women,* 212 Mass. 219, 223 (1912); *Mound City Warehouse Co.* v. *Illinois Cent. R.R.,* 51 Ill. App. 2d 103, 104, 108-110 (1964); 7 Fletcher, Cyclopedia of the Law of Private Corporations § 3451 (rev. vol. 1964). Such claims are reserved for assertion by public authority (apart from circumstances in which shareholders or creditors may assert them). The proposition is reinforced in the present situation by G. L. c. 176B, § 13, which states in part: "If the commissioner [of insurance] is satisfied, as to any medical service corporation, that (1) it has failed to comply with the provisions of its charter, or (2) it is being operated for profit, or ... (6) it has exceeded its powers, ... he may apply to the supreme judicial court for an injunction restraining it from further proceeding with its business." There is some suggestion that the present case may be so exceptional as to justify a private action because the situation of Blue Shield as a nonprofit entity may give it and its subsidiary special advantages in competing with ordinary business corporations; but that should not, we think, suffice to avoid the basic policy.[6]

---

[6] The plaintiffs cite two New Jersey cases in which sellers of grave markers were permitted to challenge competition from quasi public cemetery associations. *Terwilliger* v. *Graceland Memorial Park Ass'n,* 35 N.J. 259 (1961); *Frank* v. *Clover Leaf Park Cemetery Ass'n,* 29 N.J. 193 (1959). See also *People ex rel. J.H. Anderson Monument Co.* v. *Rosehill Cemetery Co.,* 3 Ill. 2d 592 (1954). Analogy is claimed to Blue Shield's expansion (through its subsidiary) into the sale of computerized services. To the extent that the cases permit suit by others than the Attorney General to challenge the ultra vires acts of a public charitable trust (see *Grillo* v. *Board of Realtors of the Plainfield Area,* 91 N.J. Super. 202, 213-217 [Ch. Div. 1966]), they may be inconsistent with our decision in *Ames* v. *Attorney Gen.,* 332 Mass. 246, 250 (1955). Also, the *Frank* court found that the acts of the cemetery association were *"unfair* and wrongful as well as *ultra vires competitive practices,"*

The plaintiffs attempt to find a locus standi as "aggrieved part[ies]" under G. L. c. 176B, § 17, as amended by St. 1971, c. 434, § 3: "The provisions of this chapter may be enforced by a bill in equity brought in the supreme judicial court by the commissioner, the attorney general, any district attorney or any aggrieved party." On the face of things, it seems doubtful that the reference to "aggrieved party" in § 17 should be read as providing any basis for a private action by a competitor paralleling the action accorded the Commissioner of Insurance under the above-quoted subsections of § 13. We think, further, that the background of the phrase in § 17 suggests no such reading, and that even an appeal to general law in interpreting "aggrieved" is without comfort to the plaintiffs.

The words "or any aggrieved party" were added to the text of § 17 by the 1971 amendment. We may pass over the point that "aggrieved *party*" (as contrasted with "aggrieved *person*") is customarily taken to mean one who has previously participated in an administrative hearing or was improperly denied the right to participate, which would exclude these plaintiffs. See, e.g., *Save the Bay, Inc.* v. *Department of Pub. Util.,* 366 Mass. 667, 671-675 (1975); *Wilmington* v. *Department of Pub. Util.,* 340 Mass. 432, 435-438 (1960); *Newton* v. *Department of Pub. Util.,* 339 Mass. 535, 542-544 (1959).[7] The main point is that the 1971 amendment of § 17 was one of a cluster of amendments having their origin in a narrow or parochial purpose related to ensuring that chiropractors would be treated without discrimination as participating physicians in a medical service plan. Chiropractors had in fact been recog-

---

29 N.J. at 209 (emphasis in original), and of course the plaintiffs here are free, as we hold, to sue on their charge of unfair competitive practices (count II). Lastly, the cemetery associations were not subject to continuous regulatory supervision as is Blue Shield. Any pressure to allow private actions is reduced where the activities are under such supervision.

[7] This would markedly limit the scope of "aggrieved party" as it appears in § 17 because of an overlap with § 12 dealing with certain administrative proceedings.

nized as such participants by legislation of 1969 (St. 1969, c. 880, § 1) amending c. 176B, § 1. But it appears that no contracts had actually been written with chiropractors. Statute 1971, c. 434, was directed to eliminating the "discrimination": it amended c. 176B, § 7, to emphasize and establish the right of chiropractors to participate; § 13, to give any physician entitled to participate, but discriminated against, a right of action to restrain the medical service corporation from doing further business; and § 17, to add the words "or any aggrieved party."[8] The language of a research report of the joint committee on insurance suggests that the *grievances* included may not have been confined to discrimination, but the *parties* contemplated were very likely medical practitioners and subscribers who were to be assured the right to sue to enforce provisions of c. 176B that might affect them.[9] It can be said confidently that there is no sign of an intention to reverse normal policy as reinforced by § 13 and to confer on competitors private rights of action comparable to that claimed here.[10]

A more general approach to "aggrieved," if it were permissible, would also fail to yield such a right of action. The defendants look to miscellaneous statutory schemes or arrangements in which, occasionally, courts have allowed competitors certain enforcement rights, but the decisions are not apposite here. As we said in one such case, *Everett Town Taxi, Inc.* v. *Aldermen of Everett,* 366 Mass. 534,

---

[8] The materials to be consulted are 1971 House Nos. 1483 and 1484, redrafted as 1971 Senate Nos. 1380 and 1381, consolidated as 1971 Senate No. 1402, enacted as c. 434. There were two short research reports by the joint committee on insurance.

[9] The research report notes that "Blue Cross [*sic*] . . . has not allowed one single chiropractor to become an associated physician" but "the statute [before amendment] is so drawn that should Blue Cross be guilty of this or any other violation, the person injured or affected by said violation does not have standing to go to Court and enforce the provisions of the Chapter. . . ."

[10] We note here that it should not be assumed that the rights of action of the Attorney General and district attorneys and the Commissioner under § 17 are necessarily equivalent.

124                                    371 Mass. 117

SDK Med. Cmptr. Servs. Corp. *v.* Professional Operating Mgt. Group.

538 (1974), "the mere fact that a plaintiff may suffer from business competition is not a sufficient injury to give him standing to sue." There are cases, as *Everett* says, allowing suit by one suffering competitive injury which is traceable to wrongful governmental action within an industry regulated by statute (see, e.g., *Bay State Harness Horse Racing & Breeding Ass'n* v. *State Racing Comm'n,* 342 Mass. 694, 702 [1961]; *A.B. & C. Motor Transp. Co.* v. *Department of Pub. Util.,* 327 Mass. 550, 551-552 [1951]; *American Can Co.* v. *Milk Control Bd.,* 313 Mass. 156, 159-161 [1943]);[11] and other cases allowing suit where the statute shows such a design to place the competitor within a protected zone as to implicate a right of action in him. See *Westland Housing Corp.* v. *Commissioner of Ins.,* 352 Mass. 374, 383 (1967); *Hardin* v. *Kentucky Util. Co.,* 390 U.S. 1, 5-6 (1968). See also *Investment Co. Institute* v. *Camp,* 401 U.S. 617, 620 (1971); *Association of Data Processing Serv. Organizations, Inc.* v. *Camp,* 397 U.S. 150, 153 (1970).[12] Where a regulatory or superintending governmental agency exists with power to take corrective action, but a competitor is nevertheless, in one of these exceptional situations, permitted to maintain an action, we observe (as would be expected) that the agency is a

---

[11] A court may nevertheless conclude that attack by way of securing judicial review of the administrative decision is not appropriate. For example, in *Pilgrim Co-operative Bank* v. *Commissioner of Banks,* 369 Mass. 963 (1976), we declined to allow one bank to contest an administrative decision which would allow another bank to establish a branch office that would compete with it. Such decisions, which are measured in terms of public convenience, are best suited to administrative determination and are to be left to the Commissioner of Banks. See G. L. c. 170, § 12; G. L. c. 172, § 11 (a); *First Nat'l Bank* v. *Board of Bank Incorporation,* 361 Mass. 381, 383 (1972).

[12] In the cited case sellers of data processing services and their trade association challenged the legality of a ruling by the Comptroller of the Currency permitting national banks to contract to render data processing services for others. The Court found in § 4 of the Bank Service Corporation Act of 1962, 12 U.S.C. § 1864 (1970), a legislative design to permit maintenance of such an action; and it is important to add that the plaintiffs were not asserting a private right of action against any national bank, but were suing the public official having regulatory power to correct an allegedly unlawful act on his part.

defendant or the only defendant. In all events, we point out that the data processing sector of the economy in which the present injury is said to occur is not a regulated sector; and that the statute is far from showing a positive intention to favor competitors.[13]

*Count II.* This count, charging the commission of acts of unfair competition in violation of G. L. c. 93A, § 11 (referring to § 2), was attacked by the defendants on jurisdictional grounds: § 11, inserted by St. 1972, c. 614, § 2, provides that the injured person "may ... bring an action in the superior court," and the defendants contend that that grant is exclusive. On the other hand the plaintiffs rely on G. L. c. 214, § 2, as amended by St. 1973, c. 1114, § 62, which states: "The supreme judicial court shall have original and exclusive jurisdiction of all civil actions in which equitable relief is sought cognizable under any statute ... unless a different provision is made; and the superior court shall have like original and exclusive, or like original and concurrent, jurisdiction only if the statute so provides." A reading together of these statutes, according to the plaintiffs, warrants concurrent jurisdiction in this court and the Superior Court.

The grant to the Superior Court in G. L. c. 93A, § 11, is without specific indication whether it is exclusive or concurrent. Cf. G. L. c. 80, § 7 (Superior Court given exclusive jurisdiction of certain zoning appeals); *Hull* v. *Belmont,* 309 Mass. 274, 276-281 (1941). Conceivably, the failure to mention this court in § 11 could suggest an intention to require the actions to be commenced in the Superior Court and no other place. But the first clause of G. L. c. 214, § 2, tends in the direction of concurrency.

We need not actually resolve the question. This claim under G. L. c. 93A, standing alone, is in any event more appropriately dealt with in the Superior Court than in this

---

[13] The plaintiffs attempt to support count I by calling it a civil action in the nature of quo warranto (G. L. c. 249, § 6), but the appeal to a changed nomenclature does not remedy the defects noted above, and in any case the plaintiffs do not have the "private right or interest" required by the statute.

126                                    371 Mass. 117

SDK Med. Cmptr. Servs. Corp. *v.* Professional Operating Mgt. Group.

court. The single justice dismissed count II on the juris-
dictional ground, leaving the plaintiffs free to commence
an action on the claim in the Superior Court. Instead, we
shall order so much of the present action as embodies the
claim under G. L. c. 93A (essentially count II) to be trans-
ferred to the Superior Court, with direction that the action
so transferred shall be taken to have been commenced in
that court on the date of the initiation of the action in this
court. This seems a suitable disposition in the circum-
stances even if this court lacked jurisdiction to adjudicate
the claim itself.[14]

The defendants have argued that count II is without
substantive merit because by § 3 (1) (*a*) of G. L. c. 93A,
inserted by St. 1967, c. 813, § 1, that chapter is made inap-
plicable to "transactions or actions otherwise permitted
under laws as administered by any regulatory board or
officer acting under statutory authority of the common-
wealth . . . ." This suggests to the defendants that as the
Commissioner may have administrative authority to cor-
rect the unfair competitive practices charged (see espe-
cially G. L. c. 176D, regarding unfair competition in the
business of insurance) the defendant Blue Shield (at
least) should be exempt from the provisions of G. L. c. 93A
until the administrative route has been traversed. But as
we see the situation the plaintiffs' allegations cover a range
of unfair practices. It is possible that there should be initial
reference of certain charges to the Commissioner under the
principle of *J. & J. Enterprises, Inc.* v. *Martignetti,* 369
Mass. 535 (1976) (cf. *Gordon* v. *Hardware Mut. Cas. Co.,*
361 Mass. 582, 587-588 [1972]; *Ricci* v. *Chicago Mercantile*

---

[14] When the action was instituted the question of the jurisdiction of
this court over the count II claim was doubtful, at worst, and it was
desirable that all tenable claims should be handled together as one ac-
tion. We prefer not to put the plaintiffs now to the burden of com-
mencing a fresh action on the claim. Cf. *J. & J. Enterprises, Inc.* v.
*Martignetti,* 369 Mass. 535, 540 (1976); *United States* v. *Michigan
Nat'l Corp.,* 419 U.S. 1, 5-6 (1974); *Carnation Co.* v. *Pacific Westbound
Conference,* 383 U.S. 213, 222-223 (1966).

Had an action been commenced in the Superior Court, there would
be power in this court to transfer it here under G. L. c. 211, § 4A.

371 Mass. 117                                                127

SDK Med. Cmptr. Servs. Corp. *v.* Professional Operating Mgt. Group.

*Exch.*, 409 U.S. 289 [1973]), but this, we think, is a matter for consideration by the Superior Court.[15]

*Count III.* This is a charge that the combination and practices of the defendants Blue Shield and Blue Streak tend to establish and maintain a monopoly in violation of G. L. c. 93, §§ 2 and 9. Section 2 applies to restraints in the sale of "any article or commodity in common use" and § 9 condemns combinations to destroy the trade or business of anyone "engaged in selling goods or commodities." Neither section reaches the sale of services. See *Foster* v. *Shubert Holding Co.*, 316 Mass. 470, 472-474 (1944); *Merchants Legal Stamp Co.* v. *Murphy*, 220 Mass. 281, 283-284 (1915).

The plaintiffs allege that Blue Streak provides not only services such as "computerized data processing, record keeping, and billing," but also "goods and other commodities such as printed reports of fiscal condition, statements of account, statistical reports, management reports, accounts receivable reports, and billing reports." But rarely is an intangible service performed without the involvement of some tangible. See *Freeman* v. *Chicago Title & Trust Co.*, 505 F.2d 527, 531 (7th Cir. 1974). If the service features dominate and characterize the transaction, the statutory provisions must be held inapplicable.

That is the case here; on the face of the pleading, read with ordinary experience and understanding, it appears that the analysis and processing of customers' records are the heart of the matter, the reports rendered to the customers being merely the embodiment of those services.[16]

---

[15] The plaintiffs now argue that none of the charges relates to the business of "insurance" but in their complaint they invoked c. 176D as to certain practices charged as unfair.

[16] The case of *Merchants Legal Stamp Co.* v. *Murphy,* 220 Mass. 281 (1915), does not imply a different result. The trading stamps there in question were held "articles" within the predecessor of c. 93, § 2. We emphasized that the stamps were viewed not as symbols but as "chattels of value which are the subject of sale or of bailment." *Id.* at 284. However, see, e.g., *Kennedy Theatre Ticket Serv.* v. *Ticketron, Inc.,* 342 F. Supp. 922 (D. Pa. 1972) (theatre tickets not a "commodity" under § 2[a] of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13[a] [1970]). See also *Foster* v. *Shubert Holding Co.,* 316 Mass. 470, 474 (1944) (declining to decide whether theatre tickets were "articles" within G. L. c. 93, § 2).

128                                                    371 Mass. 117

SDK Med. Cmptr. Servs. Corp. *v.* Professional Operating Mgt. Group.

Cf. *Freeman* v. *Chicago Title & Trust Co., supra* at 531 (reports on title defects are not "goods, wares, or merchandise" under § 2[c] of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13[c] [1970]); *Baum* v. *Investors Diversified Servs.,* 409 F.2d 872, 876 (7th Cir. 1969) (mutual fund share is not a "commodity" under § 2[a] of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13[a] [1970]); *Tri-State Broadcasting Co.* v. *United Press Int'l, Inc.,* 369 F.2d 268, 269-270 (5th Cir. 1966) (written news reports from reporting service are not a "commodity" under same statutory provision). Dismissal of count III was correct.[17]

*Count IV.* The plaintiffs assert in this count that the combination and acts of the defendants Blue Shield and Blue Streak will restrain competition and tend to create a monopoly in violation of the common law.[18] Our cases, however, confine any common-law proscription to monopolies of "necessities." See, e.g., *Foster* v. *Shubert Holding Co.,* 316 Mass. 470, 472-473 (1944); *Commonwealth* v. *Dyer,* 243 Mass. 472, 486 (1922), cert. denied, 262 U.S. 751 (1923); *Central Shade Roller Co.* v. *Cushman,* 143 Mass. 353, 364 (1887). This is perhaps a reflection of the fact that the early common law concerned itself with preventing manipulation of the markets for foodstuffs. See Let-

---

[17] The plaintiffs argue that whether any "article or commodity in common use" is involved within the meaning of c. 93, § 2, should not be decided on a motion to dismiss because it is a mixed question of law and fact looking to a factual inquiry. We note, however, that Federal courts routinely dismiss actions sought to be maintained under the Robinson-Patman Act when by ordinary understanding a "commodity" or the like is not in issue. See, e.g., *Baum* v. *Investors Diversified Servs.,* 409 F.2d 872, 876 (7th Cir. 1969); *Tri-State Broadcasting Co.* v. *United Press Int'l, Inc.,* 369 F.2d 268, 269-270 (5th Cir. 1966). The suggestion that such a question be remitted to trial was rejected by former Justice Clark in *Freeman* v. *Chicago Title & Trust Co.,* 505 F.2d 527, 531 n.10 (7th Cir. 1974).

[18] The relation of the common-law action to G. L. c. 93, § 2, has not been exactly elucidated and need not be for purposes of the present case. Compare *Foster* v. *Shubert Holding Co.,* 316 Mass. 470, 472-473 (1944), and *Commonwealth* v. *North Shore Ice Delivery Co.,* 220 Mass. 55, 56 (1914), with *Commonwealth* v. *McHugh,* 326 Mass. 249, 261 (1950), and *Milliken-Tomlinson Co.* v. *American Sugar Ref. Co.,* 9 F.2d 809, 815 (1st Cir. 1925).

win, The English Common Law Concerning Monopolies, 21 U. Chi. L. Rev. 355, 369 (1954). There has been criticism in some places of any such restriction of the common-law action (see, e.g., *United States* v. *Addyston Pipe & Steel Co.*, 85 F. 271, 286-287 [6th Cir. 1898], aff'd, 175 U.S. 211 [1899]), and some courts have adopted an expansive definition of that action. See, e.g., *Brown & Allen* v. *Jacobs' Pharmacy Co.*, 115 Ga. 429, 437 (1902); 54 Am. Jur. 2d Monopolies § 455 (1971). We are reluctant to make the present case the occasion for reexamining our own position, especially as the statutory provisions have largely if not altogether supplanted the common law; at any rate we have found no instances in our books of monopolistic behavior being condemned at common law apart from statute since the relevant provisions of G. L. c. 93 were enacted. It remains to say that the services here, although useful, do not qualify as "necessities." Compare *Commonwealth* v. *Dyer*, 243 Mass. 472, 486 (1922), cert. denied, 262 U.S. 751 (1923) (monopoly in sale of fish is common-law violation), with *Gloucester Isinglass & Glue Co.* v. *Russia Cement Co.*, 154 Mass. 92, 94 (1891) (contra as to monopoly in fish glue). Thus count IV fails, as the single justice held.

The order of the single justice is affirmed, except that so much of the action as states a claim under G. L. c. 93A is remitted to the Superior Court on the terms indicated in this opinion.

*So ordered.*