## CENTRAL SHADE ROLLER COMPANY *vs.* CHARLES H. CUSHMAN.

Suffolk.    November 20, 1885. — January 10, 1887.

Three manufacturers of a certain kind of curtain fixture, under different letters patent owned by them severally, desiring to avoid competition, formed a corporation in which they were the only stockholders, and an agreement was executed by the corporation, of the one part, and the three manufacturers, of the other part, by the terms of which the manufacturers gave the corporation the sole right to sell said curtain fixture for three years, the corporation agreeing to buy, at a specified price, all that the manufacturers might make, and the manufacturers acting as the selling agents of the corporation, and receiving a commission on goods sold by them. The agreement further provided, that, during the term of the contract, the manufacturers should not dispose of their patents except upon such terms that a transferee should be bound by the agreement; and that they should not dispose of their stock in the corporation without the written assent of a majority of the stockholders. *Held,* that the agreement was not void as against public policy; and that the court would restrain by injunction one of the manufacturers from selling goods on his own account, in violation of the agreement.

BILL IN EQUITY, filed January 29, 1884, alleging the following facts:

Before April 18, 1883, the defendant, Charles W. Bassett, and the Meriden Curtain Fixture Company " were each engaged in the business of making and selling a certain sort of curtain fixture known as 'wood balance shade rollers,'" which were " manufactured under several letters patent owned by the said three parties respectively;" and "said three parties did a very large business in said rollers, and were in fact the principal dealers therein, and substantially supplied the market with such rollers," though there were " other persons and corporations engaged in the manufacture, in a small way, of such rollers, under letters patent, in Boston, and elsewhere in New England and in other parts of the United States."

The " three parties desired to enter into an arrangement by which such competition might be avoided, a common schedule of prices be adopted, and all sales of such rollers be made by said three parties for the common benefit of all of them, and with an equitable participation by each in the profits made by the other two;" and, " in pursuance of such design, it was arranged by said three parties that a corporation should be formed, in which the said three parties (together with two other parties, manufacturers of wood balance shade rollers, if their coöperation could be secured) should be the only parties interested, and that all sales of said shade rollers made by any of said three parties should be for the benefit of and on account of said corporation, and the profits of all such sales should be received by such corporation, and finally divided among the members thereof as dividends upon the shares of capital stock owned by each."

In pursuance of this design, the plaintiff corporation was organized under the laws of the State of Connecticut, and, immediately after such organization, an agreement was entered into, on April 18, 1883, by the plaintiff, as party of the first part, and Cushman, Bassett, and the Meriden Curtain Fixture Company, as parties of the second part. A copy of this agreement was annexed to the bill, and its terms were, in substance, as follows:

The parties of the second part give to the plaintiff corporation the sole and exclusive right and license, for three years, to sell all wood balance shade rollers manufactured by them, with an express license under all letters patent owned or controlled by

them ; they, the parties of the second part, covenanting not to sell any of such rollers during said term, except as agents for the corporation, excepting, however, a right to sell, for jobbing or retail, in lots of not exceeding. five gross.

The corporation agrees to use its best endeavors to promote and extend the sale, by such means as may be deemed advisable by its directors.

The corporation agrees to take the rollers of the parties of the second part at specified prices, according to a schedule, which fixed a uniform price for each grade.   The prices may be subsequently varied by a three-fourths vote of stockholders, but only so as to apply without discrimination to all the parties of the second part.

The corporation is to keep books 'of account, in which a record is to be made of all sales by it in behalf of the parties of the second part.

The corporation is not to employ salesmen, but the parties of the second part are to act as agents and salesmen.   When any one of the parties of the second part shall establish an agency in any city or town for the sale of a roller made exclusively for that purpose, no other party shall take orders for the same roller in the same place.   The parties of the second part are to receive a commission on all orders ; and are to send a memorandum containing full particulars and details of each sale to the corporation.   All goods sold to be delivered by the corporation, which is alone to collect the purchase money.   The parties of the second part to be responsible for acts of their employees in violation of this agreement.

The parties of the second part, during the term of the contract, agree not to dispose of their patents, trade-marks, or the good-will of their business, except upon such terms that a transferee shall be bound by this contract.   The corporation to have no power to grant a license to use the patents, and neither party of the second part to infringe any of the patents of any other party.

" In case any of the parties of the second part shall make any new style balance roller, the same shall be examined, classified, and priced by the party of the first part before being introduced to the trade."

" It is further agreed, that each of the parties of the second part shall, for the term of this agreement, order all the spring shade roller wire and all the blank shade rollers (unless they shall make said rollers themselves) they use in the manufacture of wood spring balance rollers through the party of the first part."

"It is further agreed, that, if either of the parties of the second part shall in any way violate this agreement, either by selling shade rollers contrary to the foregoing provisions of this instrument or otherwise, the party so violating shall and will pay, as liquidated damages therefor, to the party of the first part, for such violation of this agreement, the sum of one thousand dollars; and any sums due from the party of the first part to such violators the party of the first part may apply on account of said damages, and shall further have a lien on all of the stock of such violators in the corporation party of the first part for the payment in full of such damages.

" Said parties of the second part, and each of them, hereby agree, for themselves, their executors, administrators, and assigns, with the said party of the first part, and with each other, that they will not sell, transfer, or convey any part of their stock in the Central Shade Roller Company at any time during the term of this agreement, without the written assent of a majority of the stockholders of said Central Shade Roller Company."

The parties of the second part reserve the right to sell goods strictly for export, at such prices as they may agree upon, such sales to be reported to a person named.

The bill further alleged, that the plaintiff corporation existed for the sole purpose of said agreement, and had never done any other business than that created thereby; that the defendant, Bassett, and the Meriden Curtain Fixture Company were the sole owners of the shares of the capital stock of the plaintiff corporation; and that the purpose of said agreement was to prevent competition in the sale of said shade rollers, to secure larger profits by preventing an unprofitable reduction of prices for the same, and so to merge the business of each of said parties that each should obtain an equitable share of the profits of each of the others, and that there should be a substantial identity of interest in said business.

The bill also alleged a performance of the agreement on the part of the plaintiff, and a breach of it on the part of the defendant.

The prayer of the bill was for an account; for an injunction to restrain the defendant from selling in violation of the terms of the agreement; and for further relief.

The defendant demurred to the bill for want of equity.

The case was heard on the bill and demurrer, before *Devens,* J., who ordered a decree to be entered sustaining the demurrer, and dismissing the bill. The plaintiff appealed to the full court.

*J. B. Warner,* for the plaintiff. Three owners of different patent rights in a single article, for the purpose of putting their several patents where they could be used together, and to the best advantage, formed a corporation, to which each owner gave the exclusive license to sell the articles made under the patents, taking as an equivalent for this license a part of the capital stock. It is contended by the defendant that this is void, as being in restraint of trade, or as being contrary to some public policy which guards competition in trade. To this contention there are several answers.

1. As the agreement relates to patent rights, the principles contended for by the defendant have no application. The very essence of a patent is monopoly, and the law recognizes this in every way. The argument that the public is injured by a course of dealing in patent rights is founded on the assumption that it has rights in such property, a notion utterly repugnant to the true nature of the monopoly. No case can be found which recognizes such a public right, and the attempt to apply to this subject the rules which forbid a restraint of trade is without precedent. As was said by the court, speaking of this doctrine, in *Morse Twist Drill Co.* v. *Morse,* 103 Mass. 73, " It has never been extended to a business protected by a patent. . . . . Nor does it extend to a business which is a secret, and not known to the public; because the public has no rights in the secret." See also *Taylor* v. *Blanchard,* 13 Allen, 370, 373; *Vickery* v. *Welch,* 19 Pick. 523; *Peabody* v. *Norfolk,* 98 Mass. 452; *Leather Cloth Co.* v. *Lorsont,* L. R. 9 Eq. 345; *Printing Co.* v. *Sampson,* L. R. 19 Eq. 462.

2. There is nothing in the agreement which is in restraint of trade. The burden is on the defendant to make it "plainly and obviously clear" that the contract is against public policy, such being the burden on a party who seeks "to put a restraint upon the freedom of contract." *Rousillon* v. *Rousillon*, 14 Ch. D. 351, 365. See also *Phippen* v. *Stickney*, 3 Met. 384; *Marsh* v. *Russell*, 66 N. Y. 288.

The agreement leaves to each party all his energies, and adds new inducements to use them. Each party may manufacture all he wishes, sell all he can and where he can, and the restriction on price is only one mutually beneficial, designed to secure the greatest returns, and subject to change by the parties who impose it. No party can be said to have tied his hands excepting as every member of a partnership ties his hands. The agreement is in all its purposes and consequences the same as a partnership, and the parties could have accomplished precisely the same thing by a partnership. The restraints are exactly those which a partner submits to, and no more. *Morse Twist Drill Co.* v. *Morse*, *ubi supra*. *Stearns* v. *Barrett*, 1 Pick.'443, 450. *Marsh* v. *Russell*, *ubi supra*. *Morris* v. *Colman*, 18 Ves. 437. *Wallis* v. *Day*, 2 M. & W. 273.

If the partnership character be disregarded, and the transaction be treated as a sale of the business, and brought within the familiar cases following *Mitchel* v. *Reynolds*, 1 P. Wms. 181, the restraints, if they can be so called, are good, as being reasonable in view of the undertaking, and not general restraints. *Rousillon* v. *Rousillon*, *ubi supra*.

An agreement not to sell excepting as agent, is not worse than an agreement to serve another for life as an assistant, and not otherwise carry on the trade of a carrier, nor worse than an agreement not to carry on the business of rope-maker for life except on government contracts, both of which are sanctioned by law. *Wallis* v. *Day*, *ubi supra*. *Gale* v. *Reed*, 8 East, 80.

An agreement to sell the entire product of the business to one person, who agrees to buy it, cannot possibly be a restraint, being obviously an encouragement. *Schwalm* v. *Holmes*, 49 Cal. 665. *Long* v. *Towl*, 42 Mo. 545. *Wiggins Ferry Co.* v. *Chicago & Alton Railroad*, 73 Mo. 389.

Moreover, it is not clear that the familiar principle forbidding a restraint of trade is applicable to the manufacture of a single article of trade, not a great staple.   " It has never been decided that a person could not be compelled to observe and keep an undertaking not to sell or deal in a particular article of trade. On the contrary, it has often been held that the proprietor of an article might dispose of it to another, and legally bind himself never again to deal in that article, or in any article professing to be similar to or identical with it."   Wood, V. C., in *Ainsworth* v. *Bentley*, 14 W. R. 630.   So also *Perkins* v. *Lyman*, 9 Mass. 522; *Barfield* v. *Nicholson*, 2 Sim. & Stu. 1; *Stiff* v. *Cassell*, 2 Jur. (N. S.) 348; *Ingram* v. *Stiff*, 5 Jur. (N. S.) 947.

3. But the doctrines of restraint of trade are so well settled, and they have so little application to the agreement in question, that the defendant will probably take refuge in a general objection that the arrangement is one to prevent competition, and is therefore illegal.   It is sometimes said that the law is jealous of any interference with competition, and this may appear at first-sight as an independent principle, and one upon which a legal decision may be based.   But when the cases are examined, it will appear that an interference with competition is illegal only when accomplished by illegal means, as by restraint of trade, forestalling, conspiracy, or something similar.   There is no independent legal principle in favor of competition which can carry us beyond the other and more familiar doctrines of the law.   If competition is avoided by a combination like a partnership or a corporation, this arrangement is as favored in the law as anything can be; if competition is prevented by oppression, restraint, or unlawful combination, this is odious to the law.

The cases in which agreements to prevent competition have been adjudged illegal are usually those where the end is accomplished by a wholesale restraint of trade, as in contracts not to manufacture, or not to sell at all, or except by permission of an association, or where the members of an association must entirely stop work, if so ordered.   *Hilton* v. *Eckersley*, 6 E. & B. 47. *Hornby* v. *Close*, L. R. 2 Q. B. 153.   *Central Ohio Salt Co.* v. *Guthrie*, 35 Ohio St. 666.   *India Bagging Association* v. *Kock*, 14 La. An. 168.   *Morris Run Coal Co.* v. *Barclay Coal Co.*

68 Penn. St. 173. *Arnot* v. *Pittston & Elmira Coal Co.* 68 N. Y. 558.

So, too, secret combinations to force up the price of necessaries, as by an agreement to withhold grain from the market and make a "corner," are void, as forestalling or engrossing contracts. *Raymond* v. *Leavitt*, 46 Mich. 447. *Craft* v. *McConoughy*, 79 Ill. 346. And agreements between public carriers restricting their business, or making a secret arrangement for dividing profits, are contrary to law. *Stanton* v. *Allen*, 5 Denio, 434.

These cases have been referred to as stating the sort of interference with competition which is not allowed; that, namely, which is accomplished by general and unreasonable restraint of trade in some form, and has for its object an oppressive interference with trade by great combinations of large dealers in staple articles, whose object is the negative one of beating down competitors and forcing up prices, or of the plainly illegal design of making fictitious "corners" in necessaries.

In the case at bar, there is no powerful combination, but only three out of several dealers; no necessaries or staple articles in question, but a single mechanical contrivance; no prohibition or restraint of trade, but full liberty to make all they wish, and to sell for the corporation all they can. Above all, this transaction has this vital difference, that it is a virtual partnership, an honest sharing of business and profits, a positive joint ownership in the business, instead of a negative design to prevent competition. See *Phippen* v. *Stickney, ubi supra; Gibbs* v. *Smith,* 115 Mass. 592; *Skrainka* v. *Scharringhausen,* 8 Mo. App. 522; *Jones* v. *North,* L. R. 19 Eq. 426; *Collins* v. *Locke,* 4 App. Cas. 674; *Wickens* v. *Evans,* 3 Y. & J. 318; *Mallan* v. *May,* 11 M. & W. 653, 665; *Griffiths* v. *Dudley,* 9 Q. B. D. 357, 364.

*M. Storey,* for the defendant. 1. By the agreement, the parties of the second part give the corporation the right to sell all the rollers which they severally manufacture, and the exclusive license to sell all rollers made under their patents for a period of three years, so that they in effect agree to sell their goods only to the corporation. The agreement covers also any new rollers which either party may invent. These general provisions are only modified by the clause which permits either

manufacturer to buy of the corporation and sell at retail small lots of rollers " not to exceed five gross," and by the clause which permits either to control the market in any city or town by making special rollers to be sold there through agents.

It is clear that the contracting parties intended to carry on their business substantially as before, each selling to his own customers, the only difference being that the sales were to be made in the name of the corporation, and the bills were to be collected by it.

The new corporation was merely an agent of the parties to receive and distribute the profits resulting from their combination, and existed for that sole purpose. It was the bookkeeper and treasurer of the combination. The exclusive license to sell was nominal rather than real; and the stringent character of the restraint which the parties sought to impose on each other appears from those clauses by which they are prevented from selling their patents, trade-marks, or good-will, unless the vendee is put under the obligations of the contract, and even from selling their stock in the corporation without the assent of the other parties.

2. The contract is clearly in restraint of trade, and void; and a court of equity will not enforce it. *Angier* v. *Webber*, 14 Allen, 211. *Alger* v. *Thacher*, 19 Pick. 51, 54. *Gibbs* v. *Smith*, 115 Mass. 592. *Western Union Telegraph* v. *National Telegraph*, 22 Blatchf. 108. *Sampson* v. *Shaw*, 101 Mass. 145. *Craft* v. *McConoughy*, 79 Ill. 346. *Raymond* v. *Leavitt*, 46 Mich. 447. *India Bagging Association* v. *Kock*, 14 La. Ann. 168. *Central Ohio Salt Co.* v. *Guthrie*, 35 Ohio St. 666. *Morris Run Coal Co.* v. *Barclay Coal Co.* 68 Penn. St. 173. *Stanton* v. *Allen*, 5 Denio, 434. *Arnot* v. *Pittston & Elmira Coal Co.* 68 N. Y. 558. *Keeler* v. *Taylor*, 53 Penn. St. 467. *Saratoga County Bank* v. *King*, 44 N. Y. 87. *Hartford & New Haven Railroad* v. *New York & New Haven Railroad*, 3 Roberts. 411.

3. The fact that in this case the combination relates to articles protected by patents is immaterial. A patent is intended to secure to an inventor the exclusive right to control his own invention. The value of the patent depends on the character of the invention. If there are various similar inventions of nearly equal merit, competition between them is inevitable, and

the patentee who is protected in his right to use his own cannot complain if his profits are reduced by such competition. His patent gives him no right to protect his invention by a combination to prevent this competition. Such a combination is no less contrary to public policy because the articles are patented. It is as much for the public interest to foster fair and open competition among inventors as among manufacturers of unpatented articles. For example, there are many agricultural inventions, — reapers, horse-rakes, ploughs, &c. Would a vast combination among all the patentees of these articles to increase their royalties by stifling competition be tolerated? Would the court permit all the sewing-machine companies to make such a contract as is relied on in the present case? It is clear from the decisions that the courts are not inclined to relax the rule, but that, on the contrary, they see in the pooling arrangements which have become so common between railroads, manufacturers, mining companies, and others, fresh reason for enforcing it.

4. The general rule is modified where an article is patented only so far as is necessary to secure to the patentee the fruits of his patent. He could not sell it unless he could contract not to interfere with his vendee, and hence, as incident to a sale of the patent or an interest in it, he is permitted to make a contract not to compete with his assignee. The reason of this exception does not apply to a combination like that in the case at bar. The exception is only an extension of the general principle, that the owner of a business may, on selling it, make such a contract with the purchaser as will protect the latter. If he could not, no business could be sold. *Mitchel* v. *Reynolds*, 1 P. Wms. 181. *Oregon Steam Navigation Co.* v. *Winsor*, 20 Wall. 64.

W. ALLEN, J. · The contract which is sought to be enforced by this bill, and the validity of which is the only question presented by the demurrer and argued by the parties, was made between the plaintiff, of the first part, and three manufacturers, under several patents of certain curtain fixtures, known as " wood balance shade rollers," of the second part, in pursuance of an arrangement between the persons forming the party of the second part, that the plaintiff corporation should be created for the purpose of becoming a party to the contract with them.

The general purpose of the combination was to prevent, or rather to regulate, competition between the parties to it in the sale of the particular commodity which they made.

This is a lawful purpose; but it is argued that the means employed to carry it out, the creation of the plaintiff corporation, and the terms of the contract with it, are against public policy, and are invalid.

The fact that the parties to the combination formed themselves into a corporation, of which they were the stockholders, that they might contract with it instead of with each other, and carry out their scheme through its agency, instead of that of a preëxisting person, is obviously immaterial; and the only ground upon which it can be argued that the contract is invalid is the restraint it puts upon the parties to it. Does the contract impose a restraint as to the manufacture or the sale of balance shade rollers which is void as against public policy? The contract certainly puts no restraint upon the production of the commodity to which it relates. It puts no obligation upon, and offers no inducement to, any person to produce less than to the full extent of his capacity. On the contrary, its apparent purpose is, by making prices more uniform and regular, to stimulate and increase production.

The contract does not restrict the sale of the commodity. It does not look toward withholding a supply from the market in order to enhance the price, as in *Craft* v. *McConoughy*, 79 Ill. 346, and other cases cited by the defendant. On the contrary, the contract intends that the parties shall make sales, and gives them full power to do so; the only restrictions being that sales not at retail or for export shall be in the name of the plaintiff, and reported to it, and the accounts of them kept by it, and the provision that, when any party shall establish an agency in any city or town for the sale of a roller made exclusively for that purpose, no other party shall take orders for the same roller in the same place. To these restrictions, clearly valid, is added the one which affords an argument for the invalidity of the contract, the restriction as to price. That restriction is, in substance, that the prices for rollers of the same grade made by the different parties shall be the same, and shall be according to a schedule contained in the contract, subject to

changes which may be made by the plaintiff upon recommendation of three fourths of its stockholders. In effect, it is an agreement between three makers of a commodity, that, for three years, they will sell it at a uniform price fixed at the outset, and to be changed only by consent of a majority of them. The agreement does not refer to an article of prime necessity, nor to a staple of commerce, nor to merchandise to be bought and sold in the market, but to a particular curtain fixture of the parties' own manufacture. It does not look to affecting competition from outside, — the parties have a monopoly by their patents, — but only to restrict competition in price between themselves. Even if such an agreement tends to raise the price of the commodity, it is one which the parties have a right to make. To hold otherwise would be to impair the right of persons to make contracts, and to put a price on the products of their own industry.

But we cannot assume that the purpose and effect of the combination are to unduly raise the price of the commodity. A natural purpose and a natural effect are to maintain a fair and uniform price, and to prevent the injurious effects both to producers and customers of fluctuating prices caused by undue competition. When it appears that the combination is used to the public detriment, a different question will be presented from that now before us. The contract is apparently beneficial to the parties to the combination, and not necessarily injurious to the public, and we know of no authority or reason for holding it to be invalid, as in restraint of trade or against public policy.

We have not overlooked other provisions of the contract which were adverted to in the argument, but we do not find anything which renders it invalid, or calls for special consideration.

In the opinion of a majority of the court, the entry must be,

*Demurrer overruled.*