**April BOOS, on behalf of herself and all others similarly situated, Plaintiff,**

v.

**ABBOTT LABORATORIES, Bristol–Meyers Squibb Co., Mead Johnson & Co., and American Home Products Corp., Defendants.**

Civil Action No. 95–10091–NG.

United States District Court, D. Massachusetts.

April 30, 1996.

Kenneth G. Gilman, Gilman & Pastor, Boston, MA, for April Boos.

Joseph R. Valle, Jr., Riemer & Braunstein, Boston, MA, William N. Berkowitz, Bingham, Dana & Gould, Boston, MA, for Abbott Laboratories, Bristol–Myers Squibb Company and Mead Johnson & Company.

James C. Burling, Hale & Dorr, Boston, MA, William N. Berkowitz, Bingham, Dana

& Gould, Boston, MA, for American Home Products Corp.

### MEMORANDUM AND ORDER ON DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

GERTNER, District Judge.

## I. INTRODUCTION

Plaintiff brought this action on behalf of herself and all other Massachusetts residents similarly situated for damages arising out of an alleged conspiracy among the defendants to fix prices for infant formula in Massachusetts and throughout the United States. Count I of the complaint alleges that defendants' alleged conspiracy constitutes an "unfair method of competition" or an "unfair or deceptive act or practice" within the meaning of the Massachusetts Consumer Protection Act, M.G.L. ch. 93A § 2. Count II alleges that the defendants' actions are in violation of the common law of Massachusetts.

Defendants have moved to dismiss the complaint for failure to state a claim. *See* Fed.R.Civ.P. 12(b)(6). They contend that under the doctrine of *Illinois Brick v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), plaintiff, as an indirect purchaser of infant formula from the defendants, has no standing to raise antitrust claims against them. They further contend that plaintiff's Chapter 93A claim is barred because antitrust claims are cognizable under Chapter 93A only to the extent they are cognizable under the Massachusetts Antitrust Statute, M.G.L. ch. 93, which, plaintiff concedes, recognizes no such claim.

## II. DISCUSSION

### A. *Plaintiff's Common Law Claim (Count II)*

#### 1. *Illinois Brick*

■ In *Illinois Brick v. Illinois,* the Supreme Court held that indirect purchasers of goods could not bring an action under Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15, to recover damages from violations of federal antitrust laws. The Court's analysis centered on the practicalities of antitrust litigation, and in particular, the difficulties in allocating antitrust losses between direct purchasers, and downstream customers onto whom overcharges were allegedly passed. *Illinois Brick,* 431 U.S. at 729–736, 97 S.Ct. at 2066–2070.

The Court started its discussion by referring to its decision in *Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), in which the Court had held that it was not a defense to an antitrust action to show that the plaintiff had been able to pass on any overcharges to its customers. To the contrary, the *Hanover Shoe* Court held that the plaintiff in such a suit is entitled to damages based on the entire amount that the plaintiff was overcharged, notwithstanding the fact that the plaintiff did not suffer an actual loss of profits because overcharges were passed on to consumers. *Hanover Shoe,* 392 U.S. at 491–492, 88 S.Ct. at 2231.

In *Illinois Brick,* the Court was faced with the converse situation: whether the parties to whom overcharges had been passed could maintain a cause of action against the anticompetitive actors. To hold that they could, the Court would have had to modify its rule in *Hanover Shoe,* since to do otherwise would have permitted multiple recovery of the same damages: once by the direct purchasers, and then again by the indirect purchasers. *Illinois Brick,* 431 U.S. at 729, 736, 97 S.Ct. at 2066, 2069. In particular, it was proposed that the Court modify *Hanover Shoe* to permit an allocation of damages between direct and indirect purchasers when direct and indirect purchasers were parties to the same action. *Id.* at 729–730, 97 S.Ct. at 2066–2067.

The Court rejected the proposed modification for two reasons. First, the Court reasoned that the principle of *stare decisis* dictated that in matters of statutory interpretation, where Congress is free to overrule earlier decisions by statutory amendment, Congressional silence should be interpreted as acquiescence. *Id.* at 736, 97 S.Ct. at 2069.

Second, and more significantly, the Court found that the proposed modification would greatly increase the complexity of antitrust litigation and would undermine the effectiveness of the federal antitrust laws. Under the

rule of *Hanover Shoe,* direct purchasers act as private attorneys general in the antitrust context. Their ability to realize from litigation triple the full amount of antitrust overcharging, notwithstanding their own actual damages, provides them with a significant incentive to pursue antitrust violators and to deprive them of the fruits of their illegality. *Id.* at 745, 97 S.Ct. at 2074. The Court reasoned that if indirect purchasers were potential parties, direct purchaser plaintiffs would be required to join them in all antitrust litigation and to share with them the proceeds of any action. *Id.* at 737–740, 97 S.Ct. at 2070–2072. Moreover, the Court perceived the task of allocating loss between direct and indirect purchasers as highly speculative. *Id.* at 741–743, 97 S.Ct. at 2072–2074.

Based on all of these concerns, the Court concluded that the simpler rule, allowing actions only by direct purchasers, should apply in federal antitrust litigation.

### 2. *Massachusetts Antitrust Law*

■ The Massachusetts Antitrust Act provides that:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce in the commonwealth shall be unlawful.

M.G.L. ch. 93 § 4. The Act also creates a private cause of action for "any person who shall be injured ... by reason of a violation" of the Act. M.G.L. ch. 93 § 12. The Act further provides, however, that it "shall be construed in harmony with judicial interpretations of comparable federal antitrust statutes insofar as practicable." M.G.L. ch. 93 § 1. Thus, *Illinois Brick* would appear to apply with equal force to claims brought under M.G.L. ch. 93 as it does to claims under the Clayton Act. *See Commonwealth v. Mass. CRINC,* 392 Mass. 79, 85, 90, n. 7, 466 N.E.2d 792 (1984).

Plaintiff does not dispute that she is an indirect purchaser within the meaning of *Illinois Brick* and concedes that she is therefore foreclosed from bringing suit under either the Clayton Act or the Massachusetts Antitrust Statute.[1] She contends, rather, that there exists under Massachusetts common law a nonstatutory cause of action for restraint of trade in "necessities," an action the parameters of which are not affected by *Illinois Brick. See California v. ARC America,* 490 U.S. 93, 109 S.Ct. 1661, 104 L.Ed.2d 86 (1989) (federal antitrust laws do not preempt indirect purchaser actions under state law).

Plaintiff bases her contention primarily on certain dicta found in *SDK Medical Computer Services Corporation v. Professional Operating Management Group,* 371 Mass. 117, 354 N.E.2d 852 (1976). In *SDK* the plaintiff charged that the defendants had monopolized the market for medical data processing in Massachusetts. The Court dismissed SDK's claim under M.G.L. ch. 93 because that statute, by its terms, did not encompass service industries of the type engaged in by the defendants. The Court then considered plaintiff's claim that defendants' conduct violated Massachusetts common law. The Court stated:

> Our cases ... confine any common-law proscription to monopolies of 'necessities'. This is perhaps a reflection of the fact that the early common law concerned itself with preventing manipulation of the markets for foodstuffs. There has been criticism in some places of any such restrictions of the common-law action, and some courts have adopted an expansive definition of that action. We are reluctant to make the present case the occasion for reexamining our own position, especially as the statutory provisions have largely if not altogether supplanted the common law; at any rate we have found no instances in our books of monopolistic behavior being condemned at common law apart from statute since the relevant provisions of G.L. c. 93 were enacted. It remains to say that the services here, although useful, do not qualify as 'necessities.'

1. M.G.L. ch. 93 § 1 requires that the Massachusetts Antitrust Statute be interpreted "in harmony with judicial interpretations of comparable federal antitrust statutes insofar as practicable." M.G.L. ch. 93 § 1. The extent to which it is "practicable" to interpret Massachusetts law in accord with *Illinois Brick* has not been addressed by the Massachusetts courts. Because plaintiff has not pressed a claim under M.G.L. ch. 93, there is no need to explore that question here.

*SDK,* 371 Mass. at 128–129, 354 N.E.2d 852 (citations omitted). The Court further noted in a footnote that "[t]he relation of the common-law action to G.L. c. 93 § 2 has not been exactly elucidated and need not be for the purposes of the present case." *Id.*

█ Plaintiff contends that the quoted language in *SDK* evidences the existence of a common-law cause of action for monopolization of necessities which both survives the enactment of M.G.L. ch. 93, and which permits a cause of action on behalf of indirect purchasers. Based on my review of the sources cited by plaintiffs, as well as my own research, I am unable to satisfy myself that such a cause of action exists under Massachusetts law.

Although the Court in *SDK* recognized the possibility that there might exist a cause of action for monopolization of necessities under Massachusetts common law, my research has revealed not one reported case of a successful claim of this type in Massachusetts. The rule that monopolies and contracts to restrain trade are "unlawful" is an old one, having its roots in English common law. *See United States v. Addyston Pipe & Steel Co.,* 85 F. 271, 279–281 (6th Cir.1898)·*aff'd* 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 (1899) (citing *Mitchel v. Reynolds,* 1 P.Wms. 181, 190); *Alger v. Thacher,* 19 Pick. 51 (Mass. 1837); 54 Am.Jur.2d, Monopolies, §§ 443–450. In this context, however, "unlawful" did not mean "tortious" but merely "unenforceable". *Addyston Pipe,* 85 F. at 286 ("contracts void as a restraint of trade were not unlawful in a criminal sense, and gave no right of action for damages to one injured thereby"); 54 Am.Jur.2d, Monopolies, § 447, n. 3. *See also Alger v. Thacher,* 19 Pick. 51 (1837) (refusing to enforce contract in restraint of trade); *Taylor v. Blanchard,* 13 Allen 370 (1866) (same); *Sampson v. Shaw,* 101 Mass. 145 (1869) (same); *Bishop v. Palmer,* 146 Mass. 469, 16 N.E. 299 (1888) (same); *Gamewell Fire Alarm Telegraph Co. v. Crane,* 160 Mass. 50, 35 N.E. 98 (1893) (same); *Central Shade–Roller Co. v. Cushman,* 143 Mass. 353, 364, 9 N.E. 629 (1887) (refusing to invalidate contract in restraint of trade which did not relate to "an article of prime necessity"); *Gloucester Isinglass and Glue Co. v. Russia Cement Co.,* 154 Mass. 92, 94, 27 N.E. 1005 (1891) (same).

The *Central Shade* case is most instructive in this regard. In *Central Shade,* the Court refused to invalidate a price-fixing contract among a number of "shade roller" manufacturers. Relying on the then prevalent jurisprudential notion of "freedom of contract," *see Lochner v. New York,* 198 U.S. 45, 57, 25 S.Ct. 539, 543, 49 L.Ed. 937 (1905), the Court limited the common law proscription against restraints on trade to those involving an "article of prime necessity." *Central Shade,* 143 Mass. at 364, 9 N.E. 629. Thus, rather than announcing a broad cause of action for monopolization of necessities, the *Central Shade* Court appears to have been limiting the judicial regulation of contracts arising from the ancient common law antipathy to price-fixing agreements, in a manner consistent with its own *Lochner*ian ideology.

With the passage of the Sherman Act and the Massachusetts Antitrust Statute, monopolistic practices were statutorily prohibited and the SJC's formulation in *Central Shade* became mostly moot. The drafters of the Sherman Act explained the antitrust laws as merely creating statutory remedy for acts which were already contrary to common law. *See Addyston Pipe,* 85 F. at 279–291; Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law, Vol. II, ¶ 302, n. 4 (1995) (noting the claims of the framers of the Sherman Act but contending that the common law at the time the Sherman Act was passed was actually "in an unsettled state, with little consensus about its meaning").

Similarly, the Massachusetts Antitrust Statute also purported to proscribe violations of the "common law." The first version of the Massachusetts Antitrust Statute was enacted in 1901 and made it a crime for distributors of goods to impose exclusive dealership arrangements on retailers. M.G.L. (Ter.Ed. 1932) ch. 93, § 1 added by Mass.St.1901, c. 478. The statute was considerably broadened in 1908, however, when new language specifically declared that monopolistic agreements "in violation of the common law" were

"against public policy, illegal and void."[2] M.G.L. (Ter.Ed.1932) ch. 93, § 2, added by Mass.St.1908, c. 454, § 1. The Statute gave the Attorney General authority to seek an injunction against anticompetitive conduct within Massachusetts, but recognized no cause of action for parties injured by such conduct. *See* M.G.L. (Ter.Ed.1932) ch. 93, § 3, added by Mass.St.1908, c. 454, § 2.

In 1911, the Statute was amended again to permit individuals to seek relief against monopolistic practices, but even then the relief afforded was quite limited. Individuals could file a complaint in the Supreme Judicial or Superior Court alleging conduct in violation of the Statute. If the reviewing court found the complaint colorable, it was empowered to appoint a master to hear evidence and issue a report and recommendation. The Statute provided that the master's report and recommendation would be transmitted to the attorney general, who would then "cause such further proceedings, either civil or criminal, to be instituted as such report may warrant." M.G.L. (Ter.Ed.1932) ch. 93, § 5 added by Mass.St.1911, c. 503, § 2.

Given this elaborate (and somewhat cumbersome) remedial scheme developed by the legislature, it seems unlikely that the legislature understood that individuals harmed by anticompetitive practices already had a direct legal remedy. The statute by its terms encompassed all anticompetitive practices (relating to sales of goods) "in violation of the common law", and so would appear to have encompassed the claim which plaintiffs now assert. Even if such a claim did exist prior to the enactment of the statute, it would only make sense that the comprehensive scheme laid out by the legislature in the Antitrust Statute was intended to supersede it, since it gave significantly less rights to injured parties than does the supposed common law action claimed by plaintiffs in this case.

Notwithstanding that "the statutory provisions have largely if not altogether supplanted the common law," *SDK*, 371 Mass. at 129, 354 N.E.2d 852, the scope of the common law's prohibition of monopolistic conduct has retained some relevance in the modern era. Its relevance has not been, however, to support a free standing cause of action, but rather as defining a subsidiary issue in criminal and statutory civil proceedings.

For example, in *Commonwealth v. Dyer*, 243 Mass. 472, 138 N.E. 296 (1923) *cert. denied* 262 U.S. 751, 43 S.Ct. 700, 67 L.Ed. 1214 (1923), the defendants were convicted of, among other things, common law conspiracy to monopolize the wholesale distribution of fresh fish at the New England Fish Exchange. At the time, Massachusetts had a common law of criminal conspiracy which made it a crime to take concerted action for a criminal or otherwise unlawful purpose. *Dyer*, 243 Mass. at 483, 138 N.E. 296. Under this rule, a person could be guilty of conspiracy even if it was not the aim of the agreement to commit a crime. The Court relied in part upon *Central Shade* for the proposition that the formation of a monopoly "of an essential article of food" was considered an unlawful purpose under common law. *Dyer*, 243 Mass. at 487, 138 N.E. 296.

In *Foster v. Shubert Holding Co.*, 316 Mass. 470, 55 N.E.2d 772 (1944), the Court dismissed an action by a ticket agency against a theater owner which alleged monopolization of theater ticket sales by the defendant. The plaintiff alleged that the defendant's actions had created a monopoly, "in violation of General Laws, Chapter 93, Section 2 and the common law." The SJC rec-

---

**2.** The law provided that:

Every contract, agreement, arrangement, combination or practice *in violation of the common law* whereby a monopoly in the manufacture, production, transportation or sale in the commonwealth of any article or commodity in common use is or may be created, established or maintained, or whereby competition in the commonwealth in the supply or price of any such article or commodity is or may be restrained or prevented, or whereby for the purpose of creating, establishing or maintaining a monopoly within the commonwealth of the manufacture, production, transportation or sale of any such article or commodity, the free pursuit in the commonwealth of any lawful business, trade or occupation is or may be restrained or prevented; or whereby the price of any article or commodity in common use is or may be unduly enhanced within the commonwealth, is hereby declared to be against public policy, illegal and void.

M.G.L. (Ter.Ed.1932) ch. 93, § 2 (emphasis added).

ognized that its earlier decisions had limited the common law concept of monopolization to the monopolization of articles which "satisfy an essential need of ordinary living." [3] *Foster*, 316 Mass. at 472, 55 N.E.2d 772. In applying the statute, however, the Court concluded that the statutory language had extended the common law rule beyond mere "necessities" to include all "articles or commodities in common use." *Id.* at 473–474, 55 N.E.2d 772.[4]

Finally, in *Commonwealth v. McHugh*, 326 Mass. 249, 260, 93 N.E.2d 751 (1950), the attorney general of Massachusetts brought an action under the Antitrust Statute, seeking to enjoin a fisherman's union from engaging in certain practices which limited the sale of fresh fish to union approved selling houses. Ignoring its earlier holding in *Foster* (or perhaps not believing that a fish was an "article in common use") the Court examined whether the defendants were engaged in a common law monopoly by controlling the prices of a "commodity which people are under a practical compulsion to buy." *Id.* at 261, 93 N.E.2d 751. Concluding that the defendants were engaged in such a monopoly prohibited by the statute, the Court affirmed a finding to that effect.

*McHugh* is the last reported Massachusetts case in which the Court considered the scope of the statutory prohibition of common law monopolies. In 1978, the Massachusetts Antitrust Statute was completely revised, and all references to "common law" monopolies were eliminated. The statute's prohibitory language was rewritten to track the language of federal antitrust law, and a provision was added specifically directing that the statute be interpreted consistent with that law, insofar as practicable. *See* M.G.L. ch. 93, §§ 1, 4–6. In addition, for the first time under Massachusetts law, the revised statute created a civil action for individuals damaged by anticompetitive practices, which permitted recovery of triple damages and attorneys fees. M.G.L. ch. 93, § 12.

As the foregoing chronology illustrates, there is no clear indication that Massachusetts common law ever recognized a nonstatutory cause of action against those who "contract, combine or conspire to restrain trade in necessities". The state of the law prior to statutory enactments was, as some commentators have noted, at best "unsettled", *see* Areeda & Hovenkamp, *supra;* to the extent any such claim existed, state and federal antitrust legislation have made it obsolete by specifying the framework under which relief can be obtained. To the extent that Massachusetts courts would have recognized plaintiff's claims prior to statutory enactments, I find that the legislature intended, by its passage of comprehensive antitrust legislation, to replace the common law regime and to specify fully, by statute, the remedies available for acts which would have violated the common law.

For the foregoing reasons, defendant's motion to dismiss Count II is **ALLOWED**.

## B. *Plaintiff's Chapter 93A Claim (Count I)*

The Section 2(a) of the Massachusetts Consumer Protection Act, M.G.L. ch. 93A § 2(a), makes unlawful "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Section 2(b) of the Act, M.G.L. ch. 93A § 2(b), provides that Section 2(a) is to be construed consistently with Section 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1). Since the activities prohibited under Section 5(a)(1) of the FTC Act have been construed as including activities which are violative of Section 1 of the Sherman Antitrust Act, *F.T.C. v. Cement Institute*, 333 U.S. 683, 693–694, 68 S.Ct. 793, 799–800, 92 L.Ed. 1010 (1948), M.G.L. ch. 93A § 2(a) would appear to prohibit the price-fixing activities alleged by the plaintiff in this action.

Defendants contend, however, that plaintiff has no claim under Chapter 93A because the

---

**3.** *Compare Dyer*, 243 Mass. at 487, 138 N.E. 296 ("essential article of food"); *Central Shade*, 143 Mass. at 364, 9 N.E. 629 ("article of prime necessity").

**4.** The Court assumed, *arguendo*, that theater tickets were "articles or commodities in common use", but went on to reject plaintiff's claim on other grounds. *Foster*, 316 Mass. at 475–477, 55 N.E.2d 772.

recognition of such a claim would allow plaintiff to bypass improperly the standing requirements of Chapter 93.

### 1. *The Scope of Chapter 93A*

■ Chapter 93A creates two causes of action, one for "persons engaged in trade or commerce," *see* M.G.L. ch. 93A § 11, and another for all other persons, *see* M.G.L. ch. 93A § 9. It is under Section 9 that plaintiff brings this action. Prior to 1979, actions under Section 9 were limited in two pertinent respects. First, a person could only bring an action for a violation of Section 2 if she could prove that she was damaged as a consumer, i.e. that she suffered a loss as a result of "a purchase or lease of goods, services, or real or personal property ... primarily for personal, family or household purposes." *Slaney v. Westwood Auto, Inc.*, 366 Mass. 688, 701, 322 N.E.2d 768 (1975). In addition, prior to 1979, Chapter 93A generally did not cover activities which did not occur "primarily and substantially" within Massachusetts. *See Burnham v. Mark IV Homes, Inc.*, 387 Mass. 575, 579, n. 8, 441 N.E.2d 1027 (1983).

In 1979, the legislature amended Chapter 93A in two ways relevant here. *See* Mass. Stat.1979 ch. 406 § 1. First, the legislature deleted the provision which limited the scope of Section 2 to acts occurring "primarily and substantially" within Massachusetts. Under the current law, that limitation applies to actions brought under Section 11, but does not apply to actions brought under Section 9. *Compare* M.G.L. ch. 93A § 9(1) (1996) *with* M.G.L. ch. 93A § 11, para. 8 (1996).

By its 1979 amendment, the legislature also eliminated the requirement of privity for actions under Section 9. While the former section required that the plaintiff have suffered a loss of money as the result of a purchase or lease, the current Section 9 requires only that the plaintiff be "injured by another person's use or employment of any method, act or practice declared to be unlawful by section two." *See Van Dyke v. St.*

*Paul Fire & Marine Ins. Co.*, 388 Mass. 671, 675, 448 N.E.2d 357 (1983).[5]

### 2. *Consistent Interpretation*

Defendants' principal argument is that, notwithstanding the broad standing provisions of Section 9, this Court should read into Chapter 93A, Chapter 93's bar on indirect purchaser actions because the two statutes, relating to the same subject matter, "should be construed together so as to constitute an harmonious whole." *Marco v. Green*, 415 Mass. 732, 736, 615 N.E.2d 928 (1993); *Saccone v. State Ethics Comm'n*, 395 Mass. 326, 334, 480 N.E.2d 13 (1985). Essentially, defendants argue that permitting this action to proceed under Chapter 93A would permit an "end run around the policies allowing only direct purchasers to recover under state and federal antitrust law."

This appears to be an issue of first impression in Massachusetts. In support of their position, however, defendants cite to a number of trial court decisions from other states, *see Mack v. Abbott Laboratories*, No. 94–0581–CA–D (Fla.Cir.Ct. January 17, 1995); *Blake v. Abbott Laboratories*, No. L–8950 (Tenn.Cir.Ct. June 21, 1995); and to a recent decision of the Texas Supreme Court, *see Abbott Laboratories, Inc. v. Segura*, 907 S.W.2d 503 (Tex.1995), construing similar statutes.

Of particular interest is *Segura*, the only appellate case to have addressed a question similar to the one before this Court. In *Segura*, the Texas Supreme Court held that indirect purchasers of infant formula had no standing under the Texas Deceptive Trade Practices Act (DTPA), TEX.BUS. & COM. CODE ANN. §§ 17.41–17.63 (Vernon 1987), to assert claims which amounted to allegations that the defendants had conspired to fix the wholesale prices of infant formula and to monopolize the markets for infant formula and infant formula advertising. The Court concluded that the rationales stated in *Illinois Brick* against recovery by indirect purchasers (i.e. preventing double recovery and

---

**5.** As explained in *Van Dyke*, 388 Mass. at 674–675, 448 N.E.2d 357, the legislature enacted this change, in part, to overrule the SJC's earlier decision in *Dodd v. Commercial Union Ins. Co.*, 373 Mass. 72, 365 N.E.2d 802 (1977). In *Dodd*, the SJC had held that no-fault insurance claimants could not bring an action under Section 9 if they had not actually purchased insurance from the defendant company.

avoiding difficult problems of proof) applied equally to antitrust type actions brought under the DTPA. 907 S.W.2d at 506-507.

*Segura's* persuasive weight is undermined, however, because Texas law differs from the law of Massachusetts is a number of important respects.[6] The DTPA is Texas' enactment of the Uniform Deceptive Trade Practices Act. The statute creates a cause of action for consumers who have been injured by certain specified unlawful practices, as well as by actions which are "unconscionable".[7] *See* TEX.BUS. & COM.CODE ANN. § 17.50(a)(3) (Vernon 1996). By contrast, Chapter 93A is a "mini-F.T.C." act, the prohibitions of which are specifically keyed to interpretations of Section 5 of the Federal Trade Commission Act, 15 U.S.C. 45. *See* Alperin & Chase, Massachusetts Practice, Consumer Rights and Remedies § 111 (1979).

More significantly, the enactment of the DTPA predated the enactment of Texas' own antitrust legislation by approximately 10 years. *See Segura,* 907 S.W.2d at 511 (Gonzalez, J., concurring). Thus when Texas enacted its antitrust law in 1983, it felt obliged to do so because it believed that there was no cause of action in Texas under the DTPA for antitrust violations. *Id.* at 512.

By contrast, Chapter 93A specifically requires that its prohibitions be interpreted consistently with those of the FTC Act, *see* M.G.L. ch. 93A § 2(b), which clearly includes anticompetitive conduct within it purview. *See F.T.C. v. Cement Institute,* 333 U.S. at 693-694, 68 S.Ct. at 799-800. Moreover, Section 9 of Chapter 93A was specifically amended to expanded the category of potential claimants to include those without privity with the wrongdoer. *Van Dyke,* 388 Mass. at 675, 448 N.E.2d 357. This amendment was enacted in 1979, *after* the 1978 revision of Chapter 93 which permitted individuals to bring actions for anticompetitive conduct, and *after* the Supreme Court's 1977 decision in *Illinois Brick* limiting action by individuals to those brought by direct purchasers.

It is also particularly notable that Chapter 93A Section 11 contains a specific provision requiring that courts applying it be guided by interpretations of the Massachusetts Antitrust Act. *See* M.G.L. ch. 93A § 11 para. 7. Section 9 contains no such provision. Presumably if the legislature had intended Chapter 93A Section 9 actions to be limited in this respect, it would have said so. *See Commonwealth v. Galvin,* 388 Mass. 326, 330, 446 N.E.2d 391 (1983) ("where the Legislature has employed specific language in one paragraph, but not in another, the language should not be implied where it is not present.").

Ultimately, my duty here is to apply state law as I predict the Supreme Judicial Court would decide the question. *Clarke v. Kentucky Fried Chicken of California, Inc.,* 57 F.3d 21, 24, n. 5 (1995). In making this prediction, I may refer to "analogous decisions, considered dicta, scholarly works, or other reliable sources" to determine how the SJC would rule. *Losacco v. F.D. Rich Const. Co., Inc.,* 992 F.2d 382 (1993) *cert. denied* 510 U.S. 923, 114 S.Ct. 324, 126 L.Ed.2d 270.

The SJC has described Chapter 93A as "a statute of broad impact which creates new substantive rights and provides new procedural devices for the enforcement of those rights." *Linthicum v. Archambault,* 379 Mass. 381, 383, 398 N.E.2d 482 (1979). The Court has interpreted the scope Chapter 93A Section 9 extremely broadly, to include claims where plaintiff's damages are *de minimus. See, e.g. Leardi v. Brown,* 394 Mass. 151, 157-163, 474 N.E.2d 1094 (1985) (tenants could bring action for statutory damages under M.G.L. ch. 93A for inclusion of illegal term in lease even where tenants suffered no actual harm as a result). At the same time, it has cautioned that the law does not authorize "purely vicarious suits by self-constituted private attorneys-general." *Id.* at 161, 474 N.E.2d 1094.

In determining whether Chapter 93A encompasses indirect purchaser antitrust claims, the SJC would likely consider the extremely broad language of Chapter 93A

---

6. The trial court decisions cited by defendants are all similarly distinguishable.

7. The *Segura* plaintiffs brought their claims under this catch-all "unconscionable" provision.

(permitting actions by any person injured by violations of Section 2 even in the absence of privity) in light of the prudential concerns addressed by the Supreme Court in *Illinois Brick*. The *Illinois Brick* decision was frank in its balancing of pragmatic concerns, a balancing which led the majority of Justices to conclude that a bright line rule best furthered the goals of antitrust law. 431 U.S. at 746–747, 97 S.Ct. at 2075–2076 (concluding that, "on balance", legislative intent "is better served" by a bright line rule). As the dissent in that case pointed out, however, a bright-line rule was not the only conceivable approach to the problems raised by the majority. *See* 431 U.S. at 748–765, 97 S.Ct. at 2076–2085 (Brennan, J., dissenting). In particular, the dissent noted that theoretical concerns over multiple recovery could be allayed by judicious use of procedural devices such as interpleader, transfer and consolidation of cases. The dissent also concluded that wholly independent antitrust actions against the same defendants which did not overlap in time (and thus could not be joined), were unlikely given the relatively short four year limitations period and the tendency of antitrust actions to be quite complex and lengthy. 431 U.S. at 762–763, 97 S.Ct. at 2083–2084.

It is also likely that the SJC would note that the Supreme Court has concluded that permitting indirect purchaser actions under state law is not *per se* inconsistent with the operation of federal antitrust law. In *California v. ARC America*, 490 U.S. 93, 109 S.Ct. 1661, 104 L.Ed.2d 86 (1989), the Court unanimously rejected a claim that California's antitrust law, which specifically provides for indirect purchaser actions, was inconsistent with (and thus preempted by) federal law.

In reviewing pertinent sources of authority, I find that I am unable to make a "reasonably clear" prediction, with adequate confidence, of the SJC's holding on this issue. *Clarke*, 57 F.3d 21, at n. 5. In sum, the issue before me is a novel one which has received no considered attention from Massachusetts courts. It is one about which reasonable minds can differ. The language of the statute would appear to encompass plaintiff's

action, but there are prudential arguments which weigh in the opposite direction. *See* Areeda & Hovenkamp, *supra*, at ¶ 371, p. 272 (noting that the decision whether to permit suits by indirect purchasers represents a "choice" which must be made in light of various practical considerations). In light of the these factors, and the potentially far reaching implications of the plaintiff's interpretation in this case, I conclude that the most prudent course of action is to certify the question to the Supreme Judicial Court for its authoritative resolution. *See Lehman Bros. v. Schein*, 416 U.S. 386, 390–391, 94 S.Ct. 1741, 1743–1744, 40 L.Ed.2d 215 (1974) (certification of questions of law to state tribunal, which is within sound discretion of the court, saves time, energy and resource and helps build a cooperative judicial federalism); *Maine Drilling & Blasting v. Ins. Co. of N. Amer.*, 34 F.3d 1, 3 (1st Cir.1994) (court may certify question on its own motion where there is no clear controlling precedent before it).

Accordingly, I will abstain from ruling on the defendants' motion to dismiss the complaint with respect to Count I and will certify the following question to the Massachusetts Supreme Judicial Court:

> May an individual bring an action under M.G.L. ch. 93A § 9 alleging a price-fixing conspiracy, where that individual is barred from bringing an action under federal antitrust statutes because she is an indirect purchaser within the meaning of *Illinois Brick v. Illinois*, 431 U.S. 720 [97 S.Ct. 2061, 52 L.Ed.2d 707] (1977)?

### III. CONCLUSION

For the reasons stated herein, defendants' motion to dismiss the complaint is **ALLOWED** with respect to Count II. With respect to Count I, I will abstain from ruling until an answer is received to the question certified to the SJC.

**SO ORDERED.**